# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-05-00172-CV

---

**ASAP Paging Inc., Appellant**

**v.**

**Public Utility Commission of Texas and CenturyTel of San Marcos, Inc., Appellees**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
NO. GN304831, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

---

### O P I N I O N

ASAP Paging, Inc. (ASAP) is a Commercial Mobile Radio Service (CMRS) provider that also provides wireline connections for Internet Service Providers (ISPs). ASAP alleges that CenturyTel of San Marcos, Inc. (CenturyTel) charged CenturyTel's customers a long-distance toll for calls to ASAP's paging and ISP customers in violation of federal and state telecommunications law. According to ASAP, these calls should be rated as toll-free local calls under Extended Local Calling Service (ELCS), and, if they are not so rated, the toll charge will deter CenturyTel's customers from calling ASAP's customers. In response, CenturyTel contends that it is entitled to charge a toll because the calls do not qualify for ELCS and are properly rated as long-distance. The Public Utilities Commission (PUC) found that calls from CenturyTel's customers in San Marcos to

ASAP's paging and ISP customers were properly charged long-distance toll. The district court rendered judgment affirming the PUC's order. We will affirm the judgment of the district court.

## BACKGROUND

**The regulatory framework**

To understand the context of the present dispute, we begin by surveying the framework of federal and state telecommunications regulation within which this dispute arose.

### *Federal authority*

The Telecommunications Act of 1996 (the "Telecommunications Act") amended the Federal Communications Act of 1934 and, in doing so, fundamentally altered the nature of telecommunications. *See* Pub. L. No. 104-104, 110 Stat. 56 (codified in scattered sections of 15 and 47 U.S.C.). Historically, regulation of this industry was premised on the belief that service could be provided at the lowest cost to the maximum number of consumers through a regulated monopoly network. Over many decades, state and federal agencies regulated the prices and practices of these monopolies and protected them against competitive entry. The Telecommunications Act adopts precisely the opposite approach. Rather than shielding telephone companies from competition, this Act requires telephone companies to open their networks to competition.[1] The legislation was enacted in an effort to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunication consumers and encourage the rapid

---

[1] *See In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996*, 11 FCC Rcd 15499, 15505 (1996), *aff'd in part and vacated in part sub nom.*, *Competitive Telecomms. Ass'n v. FCC*, 117 F.3d 1068 (8th Cir. 1997) (Local Competition Order).

deployment of new telecommunications technologies." Telecommunications Act pmbl, 110 Stat. at 56. The Telecommunications Act grants the Federal Communications Commission (FCC) plenary jurisdiction over telephone numbering issues and gives the FCC the authority to delegate to state commissions or certain other entities all or any portion of its jurisdiction. *See* 47 U.S.C.A. § 251(e) (West 2001).[2]

### Rate centers

Telephone numbers are assigned on a nondiscriminatory basis under the FCC by the North American Numbering Plan Administrator (NANPA). 47 C.F.R. § 52.13(a), (d) (2005).[3] NANPA issues telephone numbers in blocks of 10,000, and each telephone number has ten digits, appearing generically as: NPA-NXX-XXXX. The first three digits (NPA) represent the area code; the second three digits (NXX) identify the particular carrier and switch to which the call is routed; and the last four digits (XXXX) identify the customer served by the switch. *See id*. §§ 52.7(a), (c).

---

[2] Section 251(e) provides:

> The Commission shall create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis. The Commission shall have exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States. Nothing in this paragraph shall preclude the Commission from delegating to State commissions or other entities all or any portion of such jurisdiction.

47 U.S.C.A. § 251(e) (West 2001).

[3] "Telecommunications service" is defined as the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used. 47 C.F.R. § 52.5(h) (2005).

3

The switch is a device that channels incoming data from any of multiple input ports to the specific output port that will take the data toward its intended destination. In the traditional circuit-switched telephone network, one or more switches are used to set up a temporary connection or circuit for an exchange between two or more parties.

The NXX digits carry special importance to this case because they signify the applicable "rate center" for each telephone number. Rate centers are associated with the switches serving the calling and called parties to determine whether a call is local or toll and to compute the air mile distance for rating the toll call. Calls placed from one rate center to another center not on the local list for the caller's rate center generally are considered toll calls. Thus, most carrier billing systems rely on NPA-NXX code information for rating calls. *In re Numbering Resource Optimization*, 14 FCC Rcd 10322, 10370 (1999) (FCC NRO) (internal citations omitted).

To provide sufficient telephone numbers for their customers, telephone companies need to acquire a rate center, depending on whether they are wireless[4] or wireline providers. Wireline services are fixed to a specific location, and a subscriber's telephone number is limited to use within the rate center within which it is assigned. Wireless services, on the other hand, are not fixed to a specific location because they are mobile. Thus, while the wireless subscriber's number *is associated* with a specific geographic rate center, the wireless service *is not limited to use* within that rate center. For wire*line* services, "[NXXs] allocated to a wireline Service Provider are to be utilized to provide service to a customer's premise physically located in the same rate center that the [NXXs] are assigned." But wire*less* service providers "offer larger calling areas and thus require

---

[4] Wireless carriers include cellular and paging carriers.

4

fewer NXX codes for the wireless service, [so] they often must request as many NXX codes as are required to permit wireless customers to be called by wireline customers on a local basis." *Id.*

### *Interconnection*

After the implementation of the Telecommunications Act, incumbent local exchange carriers (ILECs) struggled with the onset of competitive local exchange carriers (CLECs) and commercial mobile radio service (CMRS) providers.[5] To make it easier for new companies to enter

---

[5] The term "local exchange carrier" means any person that is engaged in the provision of telephone exchange service or exchange access. Such term does not include a person insofar as such person is engaged in the provision of a commercial mobile service, *see* 47 U.S.C.A. § 332(c) (West 2001), except to the extent that the FCC finds that such service should be included in the definition of such term. *Id.* § 153(26).

Under traditional regulatory structures for telephone service, one telecommunications company would hold the exclusive right to provide customers within specific geographic regions of the state with basic local telephone service. Many of these companies still provide telecommunications service in Texas and are now referred to in the industry as "incumbent local exchange carriers" or "ILECs." *See Texas Bldg. Owners & Managers Ass'n v. Public Util. Comm'n*, 110 S.W.3d 524, 527 & n.1 (Tex. App.—Austin 2003, pet. denied). In the Telecommunications Act, Congress created "competitive local exchange carriers, or CLECs, defined the rights and obligations of these new carriers and of the ILECs, and eliminated barriers to competitive entry into markets. *See id.* at 528. CLECs are permitted to choose to provide services to customers in one of two ways. *Id.* CLECs can choose to buy the services of other providers at wholesale rates and then resell them at retail to end-user customers, or they can acquire and install their own equipment so as to limit or eliminate reliance on the networks of other providers. *Id.* ILECs and CLECs may be referred to collectively as "LECs."

"Mobile service" means a radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves, and includes (A) both one-way and two-way radio communication services, (B) a mobile service which provides a regularly interacting group of base, mobile, portable, and associated control and relay stations (whether licensed on an individual, cooperative, or multiple basis) for private one-way or two-way land mobile radio communications by eligible users over designated areas of operation, and (C) any service for which a license is required in a personal communications service established pursuant to the proceeding entitled "Amendment to the Commission's Rules to Establish New

the telecommunications market, the Telecommunications Act requires ILECs to provide interconnection[6] at their pre-existing networks to any requesting telecommunications carrier at any technically feasible point.[7] *See* 47 U.S.C.A. § 251(c)(2) (West 2001). This interconnection must be at least equal in quality to that provided by the ILEC to itself or its affiliates, and must be provided on rates, terms, and conditions that are just, reasonable, and nondiscriminatory. *Id*.

Two basic types of interconnection exist. Type 1 service involves interconnection to a telephone company end office similar to that provided to a private branch exchange (PBX). Under Type 1 interconnection, the telephone company owns the switch serving the CMRS network and, therefore, performs the origination and termination of both incoming and outgoing calls. Under Type 2, the CMRS provider owns the switch, enabling it to originate outgoing calls and to terminate incoming calls. *See generally Cellular Interconnection Proceeding*, 4 FCC Rcd 2369, 2372 & n. 16 (1989). ASAP uses only Type 2 interconnections.[8]

---

Personal Communications Services." 47 U.S.C.A. § 153(26).

According to the FCC, CMRS providers, such as paging carriers, offer "telecommunications" as defined in the Telecommunications Act. *See In re TSR Wireless, LLC v. US West Comms., Inc*., 15 FCC Rcd 11166, 11168 (2000); *see also* 47 U.S.C. § 153(43).

[6] "Interconnection" refers to the physical linking of two networks for the mutual exchange of traffic.

[7] There are a minimum set of five "technically feasible" points at which ILECs must provide interconnection: (1) the line side of a local switch (for example, at the main distribution frame); (2) the trunk side of a local switch; (3) the trunk interconnection points for a tandem switch; (4) central office cross-connect points; and (5) out-of-band signaling facilities, such as signaling transfer points, necessary to exchange traffic and access call-related databases.

[8] More particularly, ASAP uses Type 2A interconnections. Type 2A interconnections give the CMRS carrier the ability to connect to the Public Switched Network in the same manner as any wireline carrier. The interconnections, which may be either solely to access tandems or to a

6

In addition to providing interconnection, an ILEC must also provide dialing parity. *See* 47 U.S.C.A § 153(15) (West 2001). Dialing parity enables a customer of a new LEC to dial others with the convenience an incumbent provides, regardless of which carrier the customer has chosen as the local service provider. *See* 47 C.F.R § 51.207. Under this requirement, an ILEC will allow customers within a local calling area to dial the same number of digits (seven or ten) to make a local phone call, regardless of the customer's service provider. *Id*. The FCC has concluded that this requirement must apply to intrastate, local and toll services. *See In re Implementation of the Local Competition Provisions of the Telecomms. Act of 1996*, 11 FCC Rcd 19392, 19400, 19406 (1996) (Second Report & Order).

For CMRS providers, in order for the provider's customers to be paged or called, these calls would travel over—and eventually terminate[9] at—ILEC networks. Due to the dependency on these pre-existing networks, the FCC has established special guidelines. ILECs are obligated, pursuant to section 251(b)(5) of the Telecommunications Act and the corresponding pricing

---

combination of tandems and other central offices, are true trunk-side connections using trunk-side signaling protocols. *See In re Equal Access & Interconnection Obligations Pertaining to Commercial Mobile Radio Servs.*, 9 FCC Rcd 5408, 5452 (1994).

[9] The FCC has determined that paging terminals perform a terminating function. "Termination" is defined as "the switching or local telecommunications traffic at the terminating carrier's end office switch, or equivalent facility, and delivery of such traffic to the called party's premises." 47 CFR § 51.701(d). A paging terminal performs a "termination" function because it receives calls that originate on the LEC's network and transmits the calls from its terminal to the pager of the called party. *TSR Wireless*, 15 FCC Rcd at 11178-79. This function is analogous to what an end office switch does when it transmits a call to the telephone of the called party. *Id*. at 11179. To perform this function, the terminal first directs the page to an appropriate transmitter in the paging network, and then that transmitter delivers the page to the recipient's paging unit. *Id*. The terminal and the network thus perform routing or switching and termination. *Id*. Thus, a paging terminal is often considered the equivalent of a switch for the purpose of identifying the point of termination of a paging call. *Id*.

7

standards of section 252(d)(2), to enter into reciprocal compensation arrangements with CMRS providers, including paging providers, for the transport and termination of traffic on each other's networks. *See TSR Wireless*, 15 FCC Rcd at 11168-69, 11183. Because many CMRS providers offer telephone exchange service and exchange access, the ILECs therefore must make interconnection available to these CMRS providers in conformity with sections 251(c) and 252. *See id.* at 11183.

### *Reciprocal compensation*

The Telecommunications Act requires interconnecting LECs to establish reciprocal compensation arrangements for the transport and termination of telecommunications. 47 U.S.C.A. § 251(b)(5) (West 2001). A reciprocal compensation arrangement is one in which a carrier receives compensation from another carrier for the transport and termination of telecommunications traffic on the first carrier's network facilities. *See* 47 C.F.R. § 51.701(e). This is also referred to as "transiting traffic": traffic that originates from a carrier other than the interconnecting LEC but nonetheless is carried over the LEC network to the paging carrier's network. *TSR Wireless*, 15 FCC Rcd at 11177 n.70; *see Local Competition Order*, 11 FCC Rcd at 16016-17. In addition, the paging carrier would be responsible for paying charges for facilities ordered from the LEC to connect points on the paging carrier's side of the point of interconnection,[10] such as facilities ordered to connect the paging terminal with its antennas. *TSR Wireless,* 15 FCC Rcd at 11177 n.70.

---

[10] "Point of interconnection" is the point between the local exchange carrier and a wireless service provider that establishes the points for testing and the technical interface. It also establishes where each carrier has responsibility for the call.

*Access charges*[11]

The FCC has concluded that LECs are not required to offer wide-area calling or similar services *at all*, nor are they required to offer these services without charge. *Id*. at 11183-84. Thus, the FCC has determined that its rules do not preclude LECs from charging CMRS providers for offering wide-area calling or similar services. *Id*. Instead, the FCC concerns itself only with how carriers must compensate each other for the transport and termination of calls.[12] *See* 47 CFR § 51.703(b); *see generally TSR Wireless*, 15 FCC Rcd at 11177-78, 11181, 11184-85.

Telephone service is organized into multiple local access and transport areas (LATAs),[13] which often cross state boundaries. "IntraLATA" calls originate and terminate within

---

[11] Access charges existed in the prior regulatory regime, but Congress decided to continue enforcing these charges for local traffic. *See* 47 U.S.C.A. § 251(g) (West 2001). The Telecommunications Act stated that an LEC:

> shall provide exchange access, information access, and exchange services for such access to interexchange carriers and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding the date of enactment of the Telecommunications Act . . . under any court order, consent decree, or regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after such date of enactment.

*Id*.

[12] It does not address the charges that carriers may impose upon their end users.

[13] The term "local access and transport area" or "LATA" means a contiguous geographic area:

> (A) established before the date of enactment of the Telecommunications Act of 1996 by a Bell operating company such that no exchange area includes points within more than 1 metropolitan statistical area, consolidated

9

a single LATA whereas "interLATA" calls cross LATA boundaries. Although intraLATA calls may show up on a customer's bills as local calls, they may also appear as "in-state long distance" calls. These categories and their applicable rates are left to the discretion of the state public utility commissions.[14] The purpose of establishing the LATAs was only to delineate the areas within which the former Bell companies would be permitted to provide telecommunications services (intraLATA services); it was "not to distinguish the area in which a telephone call [would] be 'local' from that in which it becomes a 'toll' or long distance call." *United States v. Western Elec. Co.*, 569 F. Supp. 990, 995 (D.C. Circ. 1983).

To avoid access charges, it is possible to assign customers "virtual NXXs," or "VNXXs," so that a call termination is identified not by its physical location but by a location of the customer's choice. *See Global NAPS, Inc. v. Verizon New England Inc.*, 327 F. Supp. 2d 290, 295 (D. Ver. 2004). The customer thus does not pay toll charges if the VNXX is the same as the NXX of the call termination, and the call would not be subject to access charges for purposes of intercarrier compensation. *Id*. "Essentially, VNXX service converts what would otherwise be toll calls into local calls." *Id*.

---

metropolitan statistical area, or State, except as expressly permitted under the AT&T Consent Decree; or

(B) established or modified by a Bell operating company after such date of enactment and approved by the Commission.

47 U.S.C.A. § 153(25) (West 2001).

[14] *See SBC Communications, Inc. v. Federal Communications Comm'n*, 154 F.3d 226, 231 n.3 (5th Cir. 1998); *Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended*, 61 Fed. Reg. 39,397, 39,398-99 (July 29, 1996); Stuart Minor Benjamin, et al., *Communications Law & Policy* 678-79 (2001).

Access charges are usually determined by the location of the callers, but CMRS customers are mobile and may travel between locations during a single call. *Implementation of the Local Competition Provisions in the Telecomms. Act of 1996 (Part II)*, 61 Fed. Reg. 45476, 45579 (Aug. 29, 1996) (*Implementation, Part II*). The FCC has provided some guidance for service providers in determining whether the call should be local or toll. *Id.* It is not necessary for incumbent LECs and CMRS providers to ascertain geographic locations when determining the rating for any particular call at the moment the call is connected. *Id.* "For administrative convenience, the location of the initial cell site when a call begins shall be used as the determinant of the geographic location of the mobile customer." *Id.* As an alternative, ILECs and CMRS providers may use the point of interconnection between the two carriers at the beginning of the call to determine the location of the mobile caller or called party. *Id.* Ultimately, CMRS providers and LECs, both incumbent and competitive, will receive reciprocal compensation for terminating certain traffic that originates on the networks of other carriers, and will pay such compensation for certain traffic that they transmit and terminate to other carriers. *Id.*

### *ISP-bound traffic*

The internet is an international network of interconnected computers enabling people to communicate with one another and to access information from around the world. *See In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996*, 14 FCC Rcd 3689, 3690 (1999) (*Initial Order*). The internet functions by splitting up information into "small chunks or 'packets' that are individually routed . . . to their destination." *In re Federal-State Joint Bd. on Universal Serv.*, 13 FCC Rcd 11501, 11531-32 (1998). With packet-switching, "even two

11

packets from the same message may travel over different physical paths through the network" enabling users to invoke multiple internet services simultaneously and "to access information with no knowledge of the physical location of the service where the information resides." *Id.*

An Internet Service Provider (ISP) is an entity that provides its customers the ability to obtain online information through the internet. *See Initial Order*, 14 FCC Rcd at 3690. ISPs purchase analog and digital lines from LECs to connect to their dial-up subscribers. *Id.* In a typical dial-up arrangement, an ISP customer dials a seven-digit number to reach the ISP server in the same local calling area. *Id.* The ISP, in turn, combines "computer processing, information storage, protocol conversion, and routing with transmission to enable users to access Internet content and services." *Id.* (quoting *In re Federal-State Joint Bd. on Universal Serv.*, 13 FCC Rcd at 11531). Under this arrangement, the end user generally pays the LEC a flat monthly fee for use of the local exchange network and generally pays the ISP a flat, monthly fee for internet access. *Id.* The ISP typically purchases business lines from an LEC, for which it pays a flat monthly fee that allows unlimited incoming calls. *Id.*

### *State authority*

The Public Utility Regulatory Act (PURA) governs telecommunications regulation in Texas. *See* Tex. Util. Code Ann. §§ 51.001-65.252 (West 1998 & Supp. 2005).

Historically, in rural areas and small towns in Texas, calls within a small area were considered local, but calls to adjoining towns were treated as toll calls. In the rural areas, callers were charged a toll when they called geographically nearby phone numbers. In 1993, the legislature created the Expanded Toll-Free Local Calling Areas (ELCS), authorizing the PUC to expand "a

toll-free local calling area into an exchange that is not in a metropolitan exchange but is in a local calling area that is contiguous to a metropolitan exchange that the [PUC] determines has a community of interest with the exchange." Tex. Util. Code Ann. § 55.042 (West 1998); *see generally id*. §§ 55.041-.048. In particular, rural telephone customers may petition the PUC for expansion of a toll-free local calling area by demonstrating that they have a "community of interest" with the requested exchange area.[15] *Id*. § 55.042. Telephone subscribers of an ILEC exchange that serves not more than 10,000 access lines may petition the PUC for expansion of the company's toll-free local calling area if:

(1) the petitioning exchange's central switching office is located within 22 miles, using vertical and horizontal geographic coordinates, of the central switching office of the exchange requested for expanded local calling service; or

(2) the petitioning exchange's central office is not more than 50 miles from the central office of the exchange requested for expanded local calling service and the exchanges share a community of interest.

*Id*. § 55.045. The PUC may decline the petition for a variety of reasons. *Id*. § 55.044.

If the PUC approves an ELCS, customers will not be charged a toll when they call within the ELCS. Theoretically, the ILEC would lose money by routing these calls beyond their initial local calling scope without receiving the applicable toll charges. To compensate for this, the ILEC may impose a monthly fee against each individual and business customer in the petitioning

---

[15] The statute, originally written in 1993, refers to ILECs. Because of telephone deregulation and the emergence of CLECs, CLECs may also obtain ELCS service for their customers. *See* 16 Tex. Admin. Code § 26.272(d)(4)(A)(ii) (2005).

exchange. *Id*. § 55.048(b). The ILEC may also impose a monthly fee against each of its customers in the state. *Id*. § 55.048(c).

In 1995, the PUC established an ELCS between the rate center of Kyle, Fentress, and Lockhart and that of San Marcos. Accordingly, calls made between telephone customers or businesses within these cities do not have to pay a toll charge, but they do have to pay a monthly fee to their ILEC. This ELCS does not include Austin. ELCS service in that area is provided by means of direct end-to-end office trunks between the San Marcos and the Kyle, Fentress, and Lockhart exchanges.

**The dispute**

ASAP Paging, Inc. (ASAP) is a CMRS that provides paging services to its customers. It also provides internet-bound services to ISPs. ASAP bought and obtained three blocks of NXXs associated with the ELCS communities of Kyle, Fentress and Lockhart.[16] It assigned approximately thirty numbers in the Lockhart block to its paging customers[17] but did not assign any of the Kyle and Fentress blocks to paging customers, instead assigning those numbers only to ISPs. Over 99% of

---

[16] Specifically, ASAP bought and then assigned the 512/580 block to Kyle, the 512/265 block to Fentress, and the 512/384 block to Lockhart. ASAP has obtained other blocks of numbers for use in its paging business. Those blocks are not at issue in this case.

[17] Before obtaining the three blocks of NXXs, ASAP established an area-wide calling plan ("reverse toll billing arrangement") with Southwestern Bell Telephone and CenturyTel for its 512/222 NXX. Under this arrangement, ASAP pays compensation to these ILECs to allow callers in a wide central Texas area to call ASAP's paging customers without incurring a toll. Most of ASAP's paging customers use this 512/222 block, while the Lockhart, Kyle, and Fentress NXXs are assigned predominantly to the ISPs. None of ASAP's ISP customers use numbers from the 512/222 block.

calls to ASAP's Kyle, Fentress, and Lockart NXXs are directed to ASAP's ISP customers, all of whom are located in Austin.

ASAP is interconnected with two Austin LATA access tandems owned by Southwestern Bell Telephone (SWBT)[18] (Greenwood and Homestead).[19] Its switch is located in downtown Austin and services all of its Austin LATA operations. ASAP does not have a switch, end office, nor a point of interconnection in either Kyle, Fentress or Lockhart. For its paging service, an LEC can choose the path by which to transport the call to ASAP's Austin switch. Upon receipt, ASAP transmits the call to its paging terminal, also located in Austin. The terminal then transmits the call, via the internet, to a satellite service in Chicago, Illinois, which then sends a wireless signal to paging terminals, according to the paging customer's fee plan with ASAP. ISP calls are transmitted to ASAP's switch in Austin over landline interconnection trunks between SWBT and ASAP. When ASAP's switch receives the call, ASAP routes the call over wireline connections to the ISP, who is either located at ASAP's Austin switch premises or has facilities at the switch premises to transport the call to another site. ASAP's contract with the ISPs requires all call traffic to terminate at ASAP's Austin switch.

CenturyTel is an ILEC in San Marcos and has a point of interconnection there with SWBT. When a CenturyTel customer calls an ASAP customer, CenturyTel routes the call from its

---

[18] SWBT is now AT&T.

[19] Tandem is a telephony term meaning "to connect in series." A tandem office performs trunk to trunk switching. It is the midpoint of a call between two other offices. A tandem office differs from an end office. Trunks to an end office are only for the benefit of subscriber lines which terminate within that end office. Thus, a tandem switch connects one trunk to another. A tandem switch is an intermediate switch or connection between an originating telephone call or location and the final destination of the call.

end office to ASAP's Austin tandem over SWBT's intraLATA toll trunks. Initially, CenturyTel routed these calls to ASAP's Austin tandem toll-free on a temporary basis pending the negotiation of agreements regarding those calls. ASAP refused to enter into any toll-free agreement, and, consequently,[20] CenturyTel began to charge its own San Marcos customers a toll when they called ASAP's NXX. This required customers to dial the 1+ ten digit phone number if they wished to place a call from CenturyTel's San Marcos switch to ASAP's exchange. CenturyTel claims that it cannot route calls from its switch to ASAP's exchange by using the ELCS trunks,[21] because ASAP's switch is in Austin. According to CenturyTel, only the toll trunks are designed to carry these calls to ASAP's Austin switch.

To prevent CenturyTel from imposing this toll charge on CenturyTel's San Marcos customers, ASAP filed a complaint with the PUC, claiming that all calls from San Marcos to its Lockhart customers are "local" pursuant to the ELCS. The Administrative Law Judge (ALJ) held a hearing and issued a Proposal for Decision (PFD) denying relief to ASAP. The PUC issued a final

---

[20] CenturyTel claims that it was unaware that San Marcos ISPs were using telephone numbers assigned to ASAP until it received a call from San Marcos Internet complaining that it was experiencing busy calls from its dial-up customers. ASAP's operations manager claims that he investigated the complaints and realized that San Marcos Internet was using telephone numbers assigned to a paging carrier. During this time, CenturyTel reports that it also had calls from SWBT that "an additional number of trunks would have to be placed in service between the San Marcos tandem and the Austin tandem to handle an increased flow of traffic." The operations manager claims that CenturyTel did not have the appropriate agreements in place with ASAP for carriage of that level of traffic.

[21] According to CenturyTel, ASAP could establish a point of interconnection with Southwestern Bell Telephone Company in Lockhart, which would allow the calls to be completed over ELCS trunks. CenturyTel's trunks used to route Austin calls are toll trunks.

16

order, adopting, for the most part, the ALJ's PFD.[22] ASAP brought suit in the district court in Travis County, which affirmed the order. This appeal followed.[23]

## DISCUSSION

ASAP presents eight issues on appeal. In its first, second, and fourth issues, ASAP contends that the district court erred in affirming the PUC's determination that the calls in question are toll calls under CenturyTel's tariffs and applicable regulations. ASAP urges instead that calls to its NXXs should be categorized as ELCS local calls and that its Austin switch is not the termination point of the calls. In its fifth issue, ASAP contends that the district court erred in affirming that CenturyTel's actions were not anticompetitive in violation of PURA sections 52.108(3), 55.003(c), 55.005 and 55.006. In its seventh and eighth issues, ASAP argues that the district court erred in affirming the categorization of ASAP's ISP services. ASAP urges that its ISP service is "incidental" to its CMRS service and that it thus does not have to register its ISP service with the PUC. Finally, in its third and sixth issues, ASAP argues that the district court erred in affirming that CenturyTel was not in violation of federal telecommunications law regarding the right to interconnection and the right to local dialing parity.

---

[22] The PUC disagreed with the ALJ regarding jurisdictional issues that are not raised in this appeal. We will review in detail relevant portions of the order when we address ASAP's appellate issues.

[23] In addition to this appeal, ASAP has filed a petition with the FCC, which remains pending at this time.

**Standard of review**

Because many of ASAP's issues concern factual determinations made by the PUC and reviewed by the trial court, we review them under the substantial-evidence standard. *See* Tex. Util. Code Ann. § 15.001 (West 1998); *Reliant Energy, Inc. v. Public Util. Comm'n*, 153 S.W.3d 174, 184 (Tex. App.—Austin 2004, no pet.). We presume that the Commission's findings are supported by substantial evidence, and the contestant bears the burden of proving otherwise. *See Southwestern Pub. Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 215 (Tex. App.—Austin 1998, pet. denied). We will reverse and remand the cause to the agency when substantial rights of the appellant have been prejudiced by an agency's findings that are not reasonably supported by substantial evidence considering the reliable evidence in the record as a whole. Tex. Gov't Code Ann. § 2001.174(2)(E) (West 2000). However, we may not substitute our judgment for that of the agency on the weight of the evidence. *Southwestern Pub. Serv. Co.*, 962 S.W.2d at 215. "Substantial evidence" does not mean a large or considerable amount of evidence but such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact. *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988); *Lauderdale v. Department of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ). The test is not whether the agency made the correct conclusion in our view but whether some reasonable basis exists in the record for the agency's action. *Railroad Comm'n v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 41 (Tex. 1991). We must uphold an agency's finding even if the evidence actually preponderates against it so long as enough evidence suggests the agency's determination was within the bounds of reasonableness. *Southwestern Pub. Serv. Co.*, 962 S.W.2d at 215.

18

**ELCS**

In its first, second, and fourth issues, ASAP argues that the PUC erred in focusing on the geographic location of its switch. Instead, ASAP argues that, under PURA, an ELCS creates a new LEC for a geographic area and that the assigned NXX is the only relevant factor in determining whether a call is local for an ELCS. Accordingly, ASAP believes that the physical location of its point of interconnection and switch and the PUC's characterization of its business as being primarily ISP-based are irrelevant. Because calls to its NXX must therefore be local, ASAP further asserts that CenteryTel is violating the order that created the ELCS and that the PUC's order, allowing CenturyTel to impose long distance charges on calls made by its customers in San Marcos to ASAP's customers, permits CenturyTel to violate its own tariff.

### Geographic location or assigned NXX

We begin with ASAP's first issue, whether the district court erred in affirming the PUC's determination that an ELCS is a special arrangement that expands ILEC's toll-free calling only for calls that have a "geographic correlation" to the ELCS area. ASAP has not challenged the agency rules but alleges only that the rules have been misapplied to the facts.

In construing a statute, "our objective is to determine and give effect to the Legislature's intent." *National Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000). Ordinarily, we first look at the statute's plain and common meaning. *Id*. at 527. "But if a statute defines a term, a court is bound to construe that term by its statutory definition only." *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). Statutory construction is a question of law

for the court to decide. *Id.*; *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex. 1989). We review such legal questions *de novo*. *Needham*, 82 S.W.3d at 318.

In determining the scope of the PUC's authority, we must read PURA and the Telecommunications Act as a whole to discover the underlying legislative intent. *State v. Public Util. Comm'n*, 883 S.W.2d 190, 196 (Tex. 1994); *Cities of Corpus Christi v. Public Util. Comm'n*, 2005 Tex. App. LEXIS, at *21-22 (Tex. App.—Austin, Sept. 23, 2005, pet. filed). We give weight to how the PUC interprets its own powers, but only if that interpretation is reasonable and not inconsistent with the statute. *Continental Cas. Co. v. Downs*, 81 S.W.3d 803, 807 (Tex. 2002); *Cities of Corpus Christi*, 2005 Tex. App. LEXIS, at *22. The legislature intends to give an agency, created to centralize expertise in a certain regulatory area, a large degree of latitude in the methods it uses to accomplish its regulatory function. *State v. Public Util. Comm'n*, 883 S.W.2d 190, 197 (Tex. 1994); *Texas Mun. Power Agency v. Public Util. Comm'n*, 150 S.W.3d 579, 586 (Tex. App.—Austin 2004, pet. granted). Nonetheless, an agency may not, in the guise of implied powers, exercise what is effectively a new power, or a power contrary to statute, on the theory that such exercise is expedient for the agency's purpose, *City of Austin v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 441 (Tex. 2002), nor may it contravene specific statutory language, run counter to the general objectives of the statute, or impose additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions. *State v. Public Util. Comm'n*, 131 S.W.3d 314, 321 (Tex. App.—Austin 2004, pet. denied).

We construe the text of an administrative rule under the same principles as if it were a statute. *Continental Cas. Co. v. Rivera*, 124 S.W.3d 705, 709-10 (Tex. App.—Austin 2003, pet.

20

denied). We bear in mind that an administrative agency has the power to interpret its own rules, and its interpretation is entitled to great weight and deference. *Id*. at 710. The agency's construction of its rule is controlling unless it is plainly erroneous or inconsistent. *Id*.[24] We do not consider the merits of the PUC's rules on a case-by-case basis. *City of Garland v. Public Util. Comm'n of Tex.*, 165 S.W.3d 814, 819 (Tex. App.—Austin 2005, pet. filed). Rather, we consider whether the rule: (1) contravenes specific statutory language; (2) runs counter to the general objectives of the statute; or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions. *Public Util. Comm'n*, 131 S.W.3d at 321.

In PURA, the legislature gave the PUC authority to define the meanings and boundaries of the ELCS. Tex. Util. Code Ann. § 55.041. The PUC may "expand a toll-free local calling area that is not in a metropolitan exchange but is in a local calling area that is contiguous to a metropolitan exchange that the [PUC] determines has a community of interest with the exchange for which a petition is filed." *Id*. § 55.042. A community may petition the PUC for expansion of the LEC's toll-free local-calling area if the petitioning exchange's central switching office is located within twenty-two miles of the central switching office of the exchange requested for expanded local calling service or if it is "not more than 50 miles from the central office of the exchange requested for expanded local calling service and the exchanges share a community of interest." *Id*. § 55.045.

---

[24] *See also Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd.*, 156 S.W.3d 91, 98-99 n.5 (Tex. App.—Austin 2004, pet. denied) (*de novo* construction of statutes under substantial-evidence review should give due deference to agency's interpretation of its own statutes).

The PUC thus defined the ELCS as a " two-way toll-free local calling service provided by an ILEC to telephone service subscribers." 16 Tex. Admin. Code §§ 26.219(b)(1), .221(b)(3) (2005). Mirroring the statute, the PUC rules mandate that the requested exchange areas[25] have central switching offices within twenty-two miles from one another, or that they share a "community of interest," which is satisfied where the "petitioning and petitioned exchanges have a relationship because of schools, hospitals, local governments, or business centers, or that the petitioning or petitioned exchanges have other relationships that make the unavailability of ELCS a hardship on residents of the area." *Id*. §§ 26.219(d)(3)(C), (d)(3)(D) (2005); *see also* Tex. Util. Code Ann. § 55.046(b), (c); 16 Tex. Admin Code § 26.219(d)(3)(A) (ELCS status not available when central switching offices of petitioning and petitioned exchange are more than fifty miles apart).

Both PURA and the PUC rules focus on geographical data when creating an ELCS. ELCS retail rating requires a geographical nexus of twenty-two miles, or a community of interest if the geographical nexus is not more than fifty miles, between the called and calling parties. Historically, the PUC would use the NXX to determine whether the calls terminate within the ELCS's geographical requirements. Although the PUC no longer requires a geographic terminal point for an NXX, when a carrier like ASAP allows its customers to choose their NXXs *irrespective* of geographic location, it is a reasonable interpretation of the statutes to require a geographical nexus between the

---

[25] Exchange area" is defined as: "[t]he geographic territory delineated as an exchange area by official commission boundary maps. An exchange area usually embraces a city or town and its environs. There is usually a uniform set of charges for telecommunications service within the exchange area." 16 Tex. Admin. Code § 26.5(79) (West 2005).

customer and the NXX.[26] We emphasize that the default rule in this case, *without the creation of the ELCS*, would be that the calls in question would be toll calls. Only with the establishment of the ELCS, a creature of Texas state law concerning intrastate communications, could the calls be made toll free. Particularly, calls from San Marcos to one of the NXX exchanges in this case could only be toll free if made under the terms of the statute and the PUC rules. Despite ASAP's arguments to the contrary, there is no new "San Marcos-Kyle-Fentress-Lockhartlocal calling area," only a newly created ELCS, for which the existing LEC must be compensated in some manner for the costs loss of revenue associated with the creation of the ELCS. *See* Tex. Util. Code Ann. § 55.048.[27]

The PUC's construction of PURA and PUC rules controls unless it is plainly erroneous. *See Rivera*, 124 S.W.3d at 710. We find no reason to believe that the PUC's requirement of geographic proximity in the ELCS is erroneous.[28] Instead, we give deference to the PUC's approach to this dynamic and shifting area of telecommunications practice. Accordingly, because the ELCS requires a geographical nexus, ELCS eligibility may not be determined solely by the assigned NXX in this circumstance. We overrule ASAP's first issue.

---

[26] In fact, in assigning an Austin switch to the NXXs at issue here, it is ASAP's actions, and not those of the PUC, that stand in conflict with traditional geographic number assignments.

[27] We note again that, although ASAP negotiated compensation for calls associated with other NXXs, it has declined to do so for those at issue in this case.

[28] ASAP further argues that the result here unfairly bars CMRS providers from benefitting from the creation of an ELCS. We note, however, that the PUC did not make such a ruling and that ASAP could remedy the problem by establishing a geographic presence in the locations at issue in this case by arranging to receive calls at the local rate center or the tandem switch serving the rate center.

*Substantial-evidence review*

In its second issue, ASAP asserts that the PUC's order incorrectly held that CenturyTel did not violate the PUC's orders establishing the ELCS between San Marcos and Kyle, Fentress, and Lockhart. We construe this argument to consist of a substantial-evidence challenge to the PUC's conclusion that calls from CenturyTel's San Marcos customers to ASAP's paging and ISP customers were toll calls and not ELCS toll-free.

ASAP concedes that it has neither a switch nor a point of interconnection within the ELCS. When a call is made from a CenturyTel customer to an ASAP customer, whether to a paging customer or to an ISP, the call must be routed *outside* of the ELCS to ASAP's switch—located in Austin—before it can be transferred to the end-caller. Aside from its paging services, the record shows that the majority of calls to ASAP's customers were directed to ASAP's Austin ISP facilities. Only one identified ISP customer, San Marcos Internet, has offices in San Marcos. However, San Marcos Internet receives its calls through ASAP's tandem in Austin, and then *it* arranges for the call to reach its facilities in San Marcos. In addition, ASAP's contracts with its ISP customers provide that calls terminate at ASAP's switch in Austin. We find there to be substantial evidence that the calls at issue in this case are not entitled to local ELCS rating. We overrule ASAP's second issue.

*CenturyTel's tariff*

We have determined that calls to ASAP's Austin switch and point of interconnection are not entitled to ELCS retail rating because they are located outside of the ELCS geographic proximity. We now turn to ASAP's fourth issue, whether CenturyTel violated its own tariff—which

24

permits CenturyTel customers to make unlimited calls within the "local" exchange—by imposing a toll on CenturyTel customers for calls to ASAP's NXXs. In particular, ASAP argues that CenturyTel's tariff defines an exchange area as the

> unit established by [CenturyTel] for the administration of telecommunications service in a specified area for which a separate local rate schedule is provided. The area usually embraces a city, town, or village and its environs. It consists of one or more central offices, together with associated plant facilities used in furnishing telecommincations services in that area.

ASAP then notes that, after the establishment of the San Marcos-Kyle-Fentress-Lockhart ELCS, CenturyTel has connected calls without imposing a toll with SWBT and Verizon outside of San Marcos but within the ELCS. It concludes that failing to charge a toll for calls to SWBT and Verizon customers in Kyle, Fentress, and Lockhart violates the terms of CenturyTel's tariff. Otherwise, ASAP insists, the only means by which CenturyTel can act consistently with its tariff and not charge tolls on calls to SWBT and Verizon customers is to consider that the inclusion of an additional $.39 charge in CenturyTel's tariff to compensate it for the costs associated with the ELSC expands the definition of "exchange" in the tariff itself. That expansion must, by necessity, include calls to ASAP's customers.[29]

Because we have already decided that calls to ASAP's Austin switch and point of interconnection do not qualify for ELCS, CenturyTel has not violated its tariff when it connects calls

---

[29] ASAP also points out that, in its bills to customers, CenturyTel identifies calls to ASAP numbers with Lockhart NXXs as being calls to Lockhart. We are not bound by CenturyTel's billing identifiers when considering the legal question before us.

without imposing a toll from its customers to SWBT and Verizon customers in Kyle, Fentress, and Lockhart. The record establishes that CenturyTel did not treat calls to ASAP's customers differently from calls to Verizon or SWBT customers. Both Verizon and SWBT have arranged physical network facilities and points of interconnection within the ELCS to carry calls directly from San Marcos to Kyle, Fentress, and Lockhart. ASAP has not. Therefore, calls to Verizon and SWBT customers are local calls under the ELCS, and calls to ASAP customers are not. Accordingly, we agree with the PUC's determination that CenturyTel did not violate its tariffs. We overrule ASAP's fourth issue.

**PURA's anti-competitive provisions**

In its fifth issue, ASAP contends that the PUC and the district court erred by assuming that the calls to its customers were not local and by concluding that CenturyTel's actions were not anticompetitive or discriminatory. According to ASAP, these calls are local and, for that reason, CenturyTel acted anticompetitively and discriminatorily by not charging a toll on calls to customers served by wireline ILECs in Kyle, Fentress, and Lockhart while imposing a toll on calls to ASAP's paging and ISP customers. *See* Tex. Util. Code Ann. §§ 52.108(3) (West Supp. 2005), 55.003(c), .005, .006 (West 1998). We have already decided that the PUC did not err in characterizing the calls to ASAP as non-local because they terminate at ASAP's Austin switch, outside of the ELCS. In fact, CenturyTel does not treat calls to ASAP customers any differently than calls to Verizon and SWBT customers. Those companies have established interconnection facilities in the geographic area to carry ELCS calls from San Marcos to Kyle, Fentress, and Lockhart. Calls

26

to ASAP customers are always routed to Austin. ASAP could establish the physical facilities in the area or it could enter into billing agreements for those calls, but it has failed to do so. We therefore find that substantial evidence to support the PUC's determination in that CenturyTel's imposition of tolls on calls to ASAP's customers was not anticompetitive or discriminatory. We overrule ASAP's fifth issue.

**State regulation of ASAP's ISP services**

In its seventh and eighth issues, ASAP contends that its ISP service is "incidental" to its CMRS service and, accordingly, cannot be regulated by Texas or the PUC because states may not regulate purely CMRS providers. *See id*. § 51.003(5) (West 1998). ASAP further contends that the PUC cannot assert jurisdiction over it because ASAP "provides only interstate services," as opposed to both interstate and intrastate services. ASAP concludes that, because the PUC does not have jurisdiction over it, the PUC may not require it to register for its ISP services as a "basic local telecommunications service" as defined in utilities code section 51.002(1).

*Incidental services*

Specific to its seventh issue, ASAP argues that, if a telecommunications service is "incidental" to a CMRS service, a state may not regulate that "incidental" service. *See* 47 U.S.C.A. § 332(c)(3) (West 2001). Because ASAP believes that its ISP service is "incidental" to its CMRS service, it asserts that the district court erred in affirming the PUC's determination that it could require ASAP to register those services. *See* Tex. Util. Code Ann. § 52.103 (West 1998).

27

State authority is limited by the federal act, which states that "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." 47 U.S.C.A. § 332(c)(3) (West 2001). The PUC decided that ASAP's service to ISPs was not "incidental" to its CMRS services and, therefore, that it could require ASAP to register its ISP services.[30]

In this case, the record shows that none of the Kyle or Fentress NXXs, and only thirty of the Lockhart NXXs, were assigned to ASAP's paging customers (CMRS service). Therefore, the

---

[30] "Incidental" communications services have not been explicitly defined by the PUC. However, federal authority grants the right to use mobile stations in providing incidental services:

> Carriers authorized to provide other communications services incidental to the primary public mobile service for which the authorizations were issued, provided that:
>
> (a) The costs and charges of subscribers who do not wish to use incidental services are not increased as a result of provision of incidental services to other subscribers;
>
> (b) The quality of the primary public mobile service does not materially deteriorate as a result of provision of incidental services, and neither growth nor availability of the primary public mobile service is significantly diminished as a result of provision of incidental services; and
>
> (c) The provision of the incidental services is not inconsistent with the Communications Act of 1934, as amended, or with FCC rules and policies.

47 C.F.R. § 22.323.

Although the FCC has not defined the term, "incidental" as defined by the Merriam-Webster Dictionary, means "occurring merely by chance or without intention or calculation." Merriam-Webster Dictionary Online, *available at* www.m-w.com/dictionary (March 5, 2006).

28

remaining NXXs in Lockhart, and all of those in Kyle and Fentress, were assigned to ASAP's ISP customers (non-CMRS service). In addition, ASAP provides its ISP customers a wireline connection so that they can access the Internet. As the ALJ observed, the record establishes that the only service that ASAP provides ISPs is wireline transmissions of calls so that the ISPs' customers can access the internet. This service does not involve ASAP's CMRS service in any way. Instead, while not disputing the evidence in this case, ASAP would have us consider its unrelated use of the internet to transmit its paging calls to its satellite service in Chicago, which then transmits the signal to paging terminals. The ALJ and the PUC rejected ASAP's contention that the Chicago-bound internet message, which might be properly characterized as internet use incidental to CMRS service, could be attributed broadly to ASAP's transmission of calls to Austin to its ISP customers. We find that record contains substantial evidence to support the PUC's determination. Because the ISP services are not incidental to ASAP's CMRS services, the State may require ASAP to register that service. We overrule ASAP's seventh issue.

### Interstate services

In its eighth issue, ASAP argues that the PUC cannot accept jurisdiction over the ISP-bound calls because those calls are interstate and thus may be regulated only by the FCC.

State law is pre-empted under the Supremacy Clause of the United States Constitution in three circumstances. *See* U.S. Const. art. VI. First, Congress can define explicitly the extent to which its enactments pre-empt state law. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95-98 (1983). Pre-emption fundamentally is a question of congressional intent, *see Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299 (1988), and "when Congress has made its intent known through

29

explicit statutory language, the courts' task is an easy one." *English v. General Elec. Co.*, 469 U.S. 72, 79 (1990). In this case, Congress has made its intent clear that the FCC and state commissions share authority, and so we will not follow this prong of the analysis.

Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the federal government to occupy exclusively. *Id*. Such an intent may be inferred from a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an act of Congress "touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "Where . . . the field which congress is said to have pre-empted" includes areas that have "been traditionally occupied by the States," congressional intent to supersede state laws must be "'clear and manifest.'" *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977), (quoting *Rice*, 331 U.S., at 230). Again, the federal statutory language is clear that the states share regulatory authority, and so we will not apply the second prong.

Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, *see*, *e. g.*, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

In 1999, the FCC considered issues involving reciprocal compensation that LECs wanted to recover from ISPs for communications delivered to ISPs. *Initial Order*, 14 FCC Rcd at

3689-90. In considering its own jurisdiction to consider the issue, the FCC had to determine if ISP calls were intrastate (and thus outside of the FCC's jurisdiction) or interstate (and thus within its jurisdiction). *Id*. at 3696-97. The FCC thus turned to the nature of the transmission of information at issue in conducting internet business and decided ISP calls terminated at the website being accessed, not at the point at which the call is received by the ISP; thus, ISP calls could not be characterized as "local" calls. *See id*. at 3697-98. As a result, the FCC found that ISP calls were exempt from reciprocal compensation rules. *See id*. Noting that it had not yet adopted a rule governing compensation for this type of communication, *see id*. at 3703, however, the FCC held that LECs could reach their own interim agreements for the recovery of costs, to be enforced by state commissions, or that state commissions could regulate this area until the formal adoption of an FCC rule. *Id*. at 3703-05. The D.C. Circuit vacated the ruling, finding that the FCC had not adequately explained its reasoning for determining that ISP calls were not "local" calls. *Bell Atl. Tel. Cos. v. Federal Communications Comm'n*, 206 F.3d 1, 9 (D.C. Cir. 2000).

On remand, the FCC again concluded that such traffic is not subject to reciprocal compensation. *Implementation of the Local Competition Provisions in the Telecomms. Act of 1996*, 16 FCC Rcd 9151, 9152-53 (2001) (*Remand Order*). Again, the central issue was reciprocal compensation—when ILECs transported calls to ISPs related to CLECs, the ILECs argued that the call did not terminate on a CLEC line but somewhere on the internet itself, thus obviating the reciprocral compensation requirements. *Id*. at 9159. CLECs instead argued that the calls terminated at the ISP, thus making them local calls for which the CLECs would be entitled to compensation. *Id*.

The FCC found that, under section 251(g) of the Telecommunications Act, Congress "carved out" ISP services from the reciprocal compensation mandates of section 251(b)(5). *Id*. at 9152-53. The FCC abandoned its previous analysis that focused the "termination" of the call and instead adopted a position focusing on the inter/intrastate nature of the communication, concluding that "traffic bound for information service providers (including Internet access traffic) often has an interstate component." *Id*. at 9175. Because "the interstate and intrastate components cannot be reliably separated . . . ISP traffic is properly classified as interstate, and it falls under the Commission's" jurisdiction to regulate charges. *Id*. In doing so, the Commission no longer found it necessary to define at what point an internet-bound call "terminates." *Id*. at 9177. Instead, the FCC focused on the nature of the "communication":

> Most Internet-bound traffic traveling between a LEC's subscriber and an ISP is indisputably interstate in nature when viewed on an end-to-end basis. Users on the Internet are interacting with a global network of connected computers. The consumer contracts with an ISP to provide access to the Internet. Typically, when the customer wishes to interact with a person, content, or computer, the customer's computer calls a number provided by the ISP that is assigned to an ISP modem bank. The ISP modem answers the call (the familiar squelch of computers handshaking). The user initiates a communication over the Internet by transmitting a command. In the case of the web, the user requests a webpage. This request may be sent to the computer that hosts the webpage. In real time, the web host may request that different pieces of that webpage, which can be stored on different servers across the Internet, be sent, also in real time, to the user. For example, on a sports page, only the format of the webpage may be stored at the host computer in Chicago. The advertisement may come from a computer in California (and it may be a different advertisement each time the page is requested), the sports scores may come from a computer in New York City, and a part of the webpage that measures Internet traffic and records the user's visit may involve a computer in Virginia. If the user decides to buy something from this webpage, say a sports jersey, the user clicks on the purchase page and may be transferred to a secure web server in Maryland for the transaction. A single web address frequently results in the return of information from multiple computers in

32

various locations globally. These different pieces of the webpage will be sent to the user over different network paths and assembled on the user's display.

*Id*. at 9178. When "end-to-end" communications involving ISPs cross state lines, the FCC thus categorized the link that the LEC provides to connect the end-user with an enhanced service provider as interstate access service. *Id*. ISPs only technically modify and translate communication, so that their customers will be able to interact with computers across the global internet; according to the FCC, they are not the focus of the communication. *Id*. at 9180. The FCC then adopted a "bill-and-keep" compensation system, whereby each carrier recovers its costs from its own end-users, in the place of reciprocal compensation agreements. *Id*. at 9154-57.[31]

Upon review of the *Remand Order*, the D.C. Circuit again remanded the case, finding error in the FCC's interpretation of sections 251(b)(5) and 251(g), which formed the basis for the FCC's order. *WorldCom, Inc. v. Federal Communications Comm'n*, 288 F.3d 429, 430, 432-34 (D.C. Cir. 2002). The court did not vacate the Remand Order, however, finding that "there is plainly a non-trivial likelihood that the Commission has authority to elect such a system [of compensation]." *Id*. at 434. The FCC proceedings are still pending on remand and the Order on Remand remains in effect. *See Pacific Bell v. Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1122-1123 (9th Cir. 2002).

The situation at issue in this case is fundamentally different from the one considered by the FCC in its reciprocal compensation decisions. In the reciprocal compensation problem, the FCC has been attempting to solve in what manner LECs can recover their costs, but it is clear they

---

[31] We note, however, that each carrier ultimately receives compensation for its services. Whether under a reciprocal compensation or bill and keep system, each carrier is able to recover all costs associated with providing its services.

33

will be recovered in some manner. In this case, we have a simpler problem—the calls at issue travel over lines that under Texas law are toll calls. CenturyTel cannot recover its costs for transporting those calls through such mechanisms as have been provided by the ELCS statutes because no ELCS includes San Marcos and Austin, and ASAP has refused to enter into interconnection agreements to obviate the technical problems here. In this case, it does not matter whether the termination point of these calls is in Texas or any other location but in what manner the calls are physically transported, which is through lines from San Marcos to Austin that require a toll. State regulation of the intrastate service, even if it affects interstate service, is not preempted unless it thwarts or impedes a valid federal policy. *See English*, 496 U.S. at 78-79; *Louisiana Pub. Serv. Comm'n v. Federal Communications Comm'n*, 476 U.S. 355, 375 n.4 (1986). Because our holding does not thwart or impede federal policy in this area, but concerns an entirely Texas problem, we overrule ASAP's eighth issue.

**Federal rights**

In its third and sixth issues, ASAP complains that, by permitting CenturyTel to charge a toll on calls to ASAP's NXXs, the PUC violated ASAP's federal interconnection and local dialing parity rights.

*Interconnection*

ASAP first argues that the PUC's order denies it interconnection and numbering resource rights as a CMRS carrier. In particular, ASAP argues that characterizing its CMRS service

34

as "terminating" at its Austin switch in effect treats ASAP as an end-use customer of the LEC and not as a co-carrier. We disagree.

According to the FCC, a paging terminal performs a termination function because it receives calls that originate on the LEC's network and transmits the calls from its terminal to the pager of the called party. *In re TSR*, 15 FCC Rcd at 11179. To perform this function, the terminal first directs the page to an appropriate transmitter in the paging network, and then that transmitter delivers the page to the recipient's paging unit. *Id*. The terminal and the network thus perform routing or switching *and* termination. *Id*. In addition, Type 2 interconnections, such as the ones ASAP employs, are interconnection options where the CMRS provider owns the switch and provides call origination and termination functions. *Id*. at 11180.

According to the FCC, a carrier's interconnection rights concern how carriers must compensate each other for the transport and termination of calls. *Id*. at 11184. They do not concern charges which may be properly imposed on end users. *Id*. As a result, because of the overlap of FCC regulations, state regulations, and the nature of the telecommunications industry, the same call may be viewed as a local call by the carriers and a toll call by the end-user. *Id*. Even if, in this case, the paging calls are local for the purpose of carrier-to-carrier compensation, the PUC did not violate those interconnection rights by imposing long-distance tolls for those calls on the end-users. Interconnection rights do not inidicate whether the call is a toll call to the end user, an issue for the states to determine within their systems of classifying local and toll calls. Thus, we do not find an interconnection problem in this case. Furthermore, we note that it is within ASAP's ability to ameliorate this problem by entering into an interconnection agreement with CenturyTel, but it has

chosen not to do so. The record shows that CenturyTel offered to negotiate such an agreement and that ASAP did not do so.[32]

### *Local dialing parity*

Next, ASAP urges that the PUC's order violates its local dialing parity rights. *See* 47 U.S.C.A. § 251(b)(3) (West 2001). ASAP argues that, because its NXXs are local, calls from CenteryTel's customers in San Marcos to ASAP's customers should only require local dialing—seven digits (NXX-XXXX)—in the same way that calls entirely within San Marcos do.

Under section 251(b)(3) of the Telecommunications Act, an LEC is required to permit telephone exchange service customers within a defined local calling area to dial the same number of digits to make a local telephone call as they would to other customers of the LEC, notwithstanding the identity of a customer's or the called party's local telephone service provider. *Implementation of the Local Competition Provisions of the Telecomms. Act of 1996, Part III*, 61 Fed. Reg. 47,284, 47,297 (Sept. 6, 1996) (adopting 47 C.F.R. pts. 51, 52). To the extent that a CMRS provider offers telephone exchange service, such a provider is entitled to receive the benefits of local dialing parity. *Id*. at 47,298. Local dialing parity will be accomplished through implementation of the unbundling, number portability and interconnection requirements of section 251. *Id*. The provision of nondiscriminatory access to telephone numbers, by itself, does not fulfill the local dialing parity mandate of section 251(b)(3). *Id*.

---

[32] In addition, ASAP has entered into such agreements with SWBT for calls from San Marcos to ASAP's 512-222 NXX.

In adopting rules concerning local dialing parity, the FCC has recognized that a telephone call requiring seven-digit dialing is not necessarily a local call, that a telephone call requiring ten-digit dialing is not necessarily a toll call, and that some states with ELCS arrangements may have varying interpretations as to what constitutes a local or toll call. *Id*. at 47,299. The FCC has not imposed a local dialing parity rule in contravention of various state practices. *See id*. Instead, it defers to the states' definitions of local and toll calls and only mandates that service providers be given local dialing parity based on the state's approach to defining local calls, regardless of whether the service provider chooses to utilize seven or ten digit dialing procedures for those calls. *Id*.

In this case, both Verizon and SWBT have points of interconnection within the ELCS and thus are able to offer local calling with seven-digit dialing. In contrast, we have already determined that the PUC did not err in finding that calls from CenturyTel's San Marcos customers to ASAP's NXXs are not local under Texas law. CMRS providers such as ASAP have considerable latitude in assigning numbers. Although the wireless service is not limited to *use* within that rate center, the wireless subscriber's number is associated with a specific geographic rate center. *See In re Telephone Number Portability*, 18 F.C.C. Rcd 23,697, 23,701(2003). NXXs that have a nominal geographic assignment, but that are divorced by the actual method of transport from the geographic rate center, cannot be used as the sole factor in determining local dialing parity issues. In other words, it does not matter where ASAP's paging customer is; it does matter how ASAP requires CenturyTel to transport the call from San Marcos to ASAP for transmission of a paging signal to the customer.

37

The evidence in this record establishes that calls to ASAP's paging customers are transported from San Marcos to Austin. The nominal assignment of ASAP's NXXs to Kyle, Fentress, and Lockhart does not change this technological fact. In addition, the record also establishes that the majority of calls to ASAP's NXXs are calls to ASAP's ISP customers, calls that are properly understood as wireline and not CMRS calls. ASAP has no point of interconnection in the ELCS. Based on this evidence, we find that the Commission did not violate any local dialing parity issues.

### Other issues

ASAP makes further arguments that the PUC wrongly equated CMRS with a wireline network and violated ASAP's CMRS rights to use Type 2 interconnections. The thrust of ASAP's arguments on this point is that the PUC

> wrongly applies wireline concepts to ASAP's mobile, paging service when it concludes that CenturyTel can impose retail toll charges on its end users who call ASAP's paging customers who are not (or are deemed to not be) within the ELCS area. We are addressing mobile service. Being mobile—and occasionally outside the wireline local calling area—is not a crime that is punishable by a toll.

As we have noted, it is not the location of the paging customer that is at issue here. Instead, it is only the means by which calls must be transported from San Marcos to ASAP for ASAP to send a paging signal to its customers. No customer of ASAP is being "punished" for being mobile. The PUC is only allowing CenturyTel to recoup its costs from its San Marcos customers for placing a call to Austin, outside the ELCS.

In addition, ASAP attempts to compare the issues in this case to those that arise in the context of number portability. *See Central Tex. Tel. Coop. v. Federal Communications Comm'n*, 402 F.3d 205, 211-12 (D.C. Cir. 2005); *United States Telecom Ass'n v. Federal Communications Comm'n*, 400 F.3d 29, 32 (D.C. Cir. 2005).[33] Two types of "portability" exist. "Number portability" is "the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another." 47 U.S.C.A. § 153(30) (West 2001). "Location portability" to which ASAP makes its comparison, is "the ability of users of telecommunications services to retain existing telecommunications numbers without impairment of quality, reliability, or convenience when moving from one physical location to another." *Central Tex. Tel. Coop.*, 402 F.3d at 206-07. The FCC rules currently permit only a limited location portability. *See United States Telecom Ass'n*, 400 F.3d at 38. The Telecommunications Act's "requirement to provide number portability is limited to situations when users remain 'at the same location,' and 'switch[] from one telecommunications carrier to another,' and thus does not include service and location portability." *In re Telephone Number Portability*, 11 FCC Rcd 8352, 8447 (1996) (citing 47 U.S.C.A. § 153(30)). As the D.C. Circuit has observed, location portability has a distinctly geographic focus. *United States Telecom Ass'n*, 400 F.3d at 32, 37. Telephone subscribers must change their telephone numbers when they move outside the area served by their

---

[33] The FCC and the D.C. Circuit have not fully determined this issue. The cases we have reviewed concern issues of wireline-to-wireless portability that have been resolved against the FCC on procedural grounds. We will review their holdings inasmuch as they aid an understanding of the purpose and function of number portability.

current central office, defined as the location of the switch. *Central Tex. Tel. Coop.*, 402 F.3d at 207. Thus, location portability only exists when a wireline customer moves physical location within the area covered by the switch identified with the existing NXX. "In the completely wireless context, however, customers who move, temporarily or permanently, may retain their numbers. They may do so not because there is location portability, but because, despite their moves, they are still within an area their current wireless carrier serves." *Id*. at 212. In other words, calls to wireless customers utilize the technological rate centers as originally assigned; there are no location portability issues because a call to the wireless customer is still transported to the same switch as originally assigned without regard to the location of the wireless customer.

The relationship between a wireline and a wireless company in portability is different. Although the geographic location of the wireless customer may not be controlling, *when porting numbers to wireless carriers* that do not have a point of presence in the local area, a donating carrier delivering a call to a ported number might be forced to deliver the call outside of its local service area. *See id*. at 208. It would thereby incur transport charges that were not factored into its rate. *Id*. To focus on the "location" of the telephone number, based solely on its nominal rate center assignment, "is at best metaphysical." *See United States Telecom Ass'n*, 400 F.3d at 37.

ASAP's reference to the number portability issues does not inform our analysis here. Portability, in essence, requires the rating of formerly local calls as local when the number has been "ported" to another carrier within the same geographic rate center. Problems have arisen concerning the portability of wireline numbers to wireless providers when the customer has also moved geographic locations. However, the portability issues only preclude charging a toll on a call that was

local before the number was ported to another carrier and might thus become a toll call but for the portability requirements. ASAP's numbers neither were ported from another carrier nor have they ever been in CenturyTel's geographic rate center. Thus, we do not find that portability issues illuminate the problems in this case.

*Conclusion as to interconnection and local dialing parity rights*

We have rejected ASAP's arguments concerning its interconnection and local dialing parity rights. We overrule ASAP's third and sixth issues.

**CONCLUSION**

Having overruled ASAP's issues on appeal, we affirm the judgment of the district court affirming the order of the PUC.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed: May 5, 2006

41