TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00793-CV






Public Utility Commission of Texas; and Electric Transmission Texas, LLC, Appellants


v.


Cities of Harlingen, McAllen, Mission, Port Lavaca, Rockport, and Victoria;

State of Texas; and Texas Industrial Energy Consumers, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT

NO. D-1-GV-08-000253, HONORABLE DARLENE BYRNE, JUDGE PRESIDING





O P I N I O N


 This case involves an administrative appeal challenging an order of the Public Utility
Commission of Texas approving the application of Electric Transmission Texas, LLC (ETT) for
regulatory approval of (1) ETT's formation transactions, (2) the transfer to ETT of certain
transmission equipment held under another utility's certificate of convenience and necessity (CCN),
and (3) ETT's initial rates. Prior to the administrative proceeding, ETT did not possess a CCN under
which it could provide service to the public as an electric utility pursuant to the Public Utility
Regulatory Act (PURA). (1) Following the Commission's order, ETT was approved to become an
electric utility that provided only transmission-related services.

 The district court found that the Commission exceeded its statutory authority by
granting a CCN to ETT, and reversed the Commission's order. The district court also found that
the Commission erred by denying the municipalities that had intervened in the proceeding any of
their expenses, and the court remanded the case to the Commission for a redetermination of the
municipalities' reasonable expenses pursuant to PURA section 33.023.

 The Commission and ETT appeal the district court's judgment. We hold that the
Commission acted within its statutory authority in granting a CCN to ETT, and in approving the
transfer to ETT of rights obtained under a CCN pursuant to PURA section 37.154 without requiring
compliance with the provisions of section 37.056. We also hold that the Commission's approval of
the underlying formation transactions is supported by substantial evidence. However, we conclude
that the Commission erred in determining that it was prohibited from granting the intervening
municipalities reimbursement of their reasonable expenses. Consequently, we affirm the judgment
of the district court as to its remand of the case for the Commission's reconsideration of whether to
reimburse the municipalities for their expenses, and we reverse the remainder of the judgment of the
district court and render judgment that the Commission's final order is otherwise affirmed.


Factual and Procedural Background

 ETT filed an application with the Public Utility Commission in January 2007, seeking
regulatory approvals needed to commence operations. ETT sought to become an electric utility
whose activities would be limited to acquiring, constructing, owning, and operating transmission
facilities within the state overseen by the Electric Reliability Council of Texas (ERCOT). 
Transmission for purposes of this proceeding involves transporting electricity over power lines at
higher voltage. ETT would be owned in equal 50% shares by subsidiaries of American Electric
Power Company, Inc. and MidAmerican Energy Holdings Company. American Electric Power's
investment was to include the transmission assets to be transferred, which had been constructed and
were operated by its subsidiary AEP Texas Central Company (TCC) under an existing CCN, and
MidAmerican was to contribute a comparable amount of cash to capitalize the venture. The facilities
and related rights that would initially be transferred, subject to ETT's application, were not yet in
TCC's rates.

 ETT applied to the Commission for a CCN to provide service as an electric utility in
Texas, see Tex. Util. Code Ann. § 37.051(a) (West 2007), for approval of the transactions to form,
capitalize, and structure ETT, see id. § 14.101 (West 2007), and for approval of ETT's initial rates
for transmission service, see id. § 36.001 (West 2007). (2) Appellees--the Cities of Harlingen,
McAllen, Mission, Port Lavaca, Rockport, and Victoria (the "Cities"), Texas Industrial Energy
Consumers (TIEC), and the State of Texas--separately intervened in the proceeding, contesting
portions of ETT's application.

 On December 21, 2007, the Commission on rehearing issued its final order on ETT's
application. The Commission found that the PURA contemplates the certification of a utility
providing only transmission services. The Commission also found that, although ETT had originally
requested a CCN in its application pursuant to PURA section 37.056, which governs the grant of a
CCN, see id. § 37.056 (West 2007), it was more appropriate to apply PURA section 37.154, which
governs the transfer of a CCN, see id. § 37.154 (West 2007). The Commission then granted ETT's
application for the transfer to ETT of TCC's right to operate the initial facilities under the existing
CCN in accordance with section 37.154, and approved ETT's formation transactions as in the
public interest taking into consideration the factors set out in PURA section 14.101. In addition, the
Commission set ETT's initial rates, granted ETT's request for expense reimbursement, and denied
the Cities' request for reimbursement of their expenses incurred in connection with the proceeding. (3)

 Appellees the Cities, TIEC, and the State separately sought review of the
Commission's order in district court, and the causes were consolidated by request of the parties. 
ETT intervened in the case in support of the Commission's final order. Appellees challenged the
transfer of the CCN by asserting that a utility which provides only transmission services and,
therefore, which has no certificated service area cannot obtain a CCN under the PURA, that a utility
without a preexisting CCN cannot receive by transfer rights obtained under another utility's CCN
unless the requirements of PURA section 37.056 are satisfied, and that approval of the transfer under
section 37.154 despite the application's citing only sections 37.051 and 37.056 was a violation of
appellees' right to due process and was outside of the Commission's subject-matter jurisdiction. 
Appellees also challenged the approval of ETT's formation transactions, asserting that the
Commission's determination that the transactions satisfied PURA section 14.101 was not supported
by substantial evidence. Lastly, the Cities challenged the Commission's denial of their request for
reimbursement of expenses.

 On October 8, 2008, the district court issued its judgment in favor of appellees,
reversing the Commission's order. The judgment contains the following findings:


 (1) the primary issues the Court considered in issuing this Order relate to
questions of statutory construction and procedural due process and are
therefore reviewed de novo;


 (2) the Public Utility Commission ("PUC") exceeded its statutory authority by
granting Electronic [sic] Transmission Texas, LLC ("ETT") a certificate of
convenience and necessity ("CCN") pursuant to the Public Utility Regulatory
Act, Tex. Utilities Code § 37.154 ("PURA") instead of analyzing the request
for a CCN pursuant to PURA §§ 37.051 and 37.056, the relevant statutes;


 (3) the PUC violated the Plaintiffs' due process rights when it granted ETT a
CCN based on PURA § 37.154 when such basis was not pled or raised by the
PUC or ETT until after the close of evidence below;


 (4) the PUC exceeded its statutory authority and lacked subject matter
jurisdiction by granting ETT a CCN based on PURA § 37.154 while
accepting jurisdiction over the case based on different statutes, PURA
§§ 37.051 and 37.056;


 (5) the PUC exceeded its statutory authority in granting a CCN to ETT, a
transmission-only utility without a service area; and further


 (6) the PUC exceeded its statutory authority in denying the City Plaintiffs any of
their reasonable rate case expenses pursuant to PURA § 33.023.


In accordance with these six findings, the district court remanded the case to the agency for action
consistent with the court's opinion and "for a determination and award of the Cities' reasonable
rate case expenses, if any, pursuant to PURA § 33.023." In addition, the district court expressly
declined to rule on the issue of whether substantial evidence supported the Commission's findings
under PURA section 14.101.

 Appellants--the Commission and ETT--appeal the judgment of the district court,
specifically challenging paragraphs (2) through (6). In the event that we affirm the district court's
judgment as to paragraphs (2) through (5), ETT further requests that we clarify the scope of remand
to the Commission. In the event that we reverse the district court's judgment as to paragraphs (2)
through (5), appellees request that we remand the case for the district court to perform the substantial
evidence review that the district court had deemed unnecessary based on its findings.


Transmission-Only Utilities Without a Service Area

 The district court, in paragraph (5) of its judgment, found that the Commission
"exceeded its statutory authority in granting a CCN to ETT, a transmission-only utility without a
service area." Appellants argue that, for a utility to obtain a CCN, the PURA does not require that
the utility provide any services in addition to transmission services, or that such a utility have a
certificated service area.

 Statutory construction presents a question of law that we review de novo. See State
v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). An agency may exercise those specific powers that
the law confers upon it in clear and express language, including whatever powers are reasonably
necessary to fulfill a function or perform a duty expressly placed in the agency. Public Util. Comm'n
v. GTE-Southwest, Inc., 901 S.W.2d 401, 407 (Tex. 1995) (citing Kawasaki Motors v. Motor
Vehicle Comm'n, 855 S.W.2d 792, 797 (Tex. App.--Austin 1993, writ denied)). The agency may
not, however, erect and exercise what really amounts to a new and additional power or one that
contradicts the statute, regardless of how expedient the new power may be for administrative
purposes. Id. (citing Sexton v. Mount Olivet Cemetery Ass'n, 720 S.W.2d 129, 137-38
(Tex. App.--Austin 1986, writ ref'd n.r.e.)).

 The applicable definitions in the PURA contemplate that a utility may be a
transmission-only utility. The PURA defines an "electric utility" in general to include a person "that
owns or operates for compensation in this state equipment or facilities to produce, generate, transmit,
distribute, sell, or furnish electricity in this state." Tex. Util. Code Ann. § 31.002(6) (West 2007). 
This definition does not require that an electric utility provide a service in addition to transmission. 
See id. Similarly, the PURA defines a "transmission and distribution utility" (TDU) in general as "a
person or river authority that owns or operates for compensation in this state equipment or facilities
to transmit or distribute electricity." Id. § 31.002(19). The definition does not require a TDU to
provide transmission and distribution services. See id. ETT, therefore, by obtaining equipment or
facilities in this state to transmit electricity, by definition became an electric utility and a TDU. See
id. § 31.002(6), (19). (4)

 Appellees argue that, regardless of whether a transmission-only utility qualifies as
an electric utility and a TDU, the Commission does not have statutory authority to grant a CCN
to such a utility. In order to provide service to the public, an electric utility must obtain from the
Commission a CCN--a "certificate that states that the public convenience and necessity requires
or will require the installation, operation, or extension of the service." Id. § 37.051(a). Appellees
contend that the sections of the PURA governing a utility's receipt of a CCN--sections 37.056 and
37.154--are inconsistent with the certification of a transmission-only utility. Section 37.056 of the
PURA provides authority for the Commission to grant a CCN, provided that the Commission
finds that "the certificate is necessary for the service, accommodation, convenience, or safety of
the public." Id. § 37.056(a). However, appellees do not offer a persuasive explanation as to why
a transmission-only utility could not satisfy this requirement. As an alternative method for a utility
to obtain a CCN, section 37.154 of the PURA provides that an "electric utility may sell, assign, or
lease a certificate or a right obtained under a certificate if the commission determines that the
purchaser, assignee, or lessee can provide adequate service." Id. § 37.154(a). Again, appellees do
not offer a persuasive explanation as to why a transmission-only utility could not "provide adequate
service." Based on the plain language of sections 37.056 and 37.154, each of which provides the
Commission authority to approve a utility's receipt of a CCN, the Commission has been given the
power to approve a CCN for a utility that provides only transmission services, provided that such
services meet the applicable standards.

 Appellees express concern that a transmission-only utility is "a type never before seen
in Texas," and indicate that for such a utility to be statutorily authorized to obtain a CCN, the above-cited statutes would need to expressly reference a transmission-only utility. However, none of the
above-cited statutes expressly references any specific type of utility. See id. §§ 37.051(a), .056(a),
.154(a). If a specific statutory reference to a particular type of utility were necessary to authorize the
Commission to issue a CCN, no utility would be statutorily authorized to obtain a CCN because
there would be no corresponding statutory reference to the specific type that the applying utility
happened to be. Such an interpretation of these statutes is not consistent with the purpose of the
statutory scheme and would lead to an unreasonable result. See Tex. Gov't Code Ann. § 311.021(3)
(West 2005) (for statutory construction, presumption that just and reasonable result intended). 
Therefore, the fact that a utility provides only transmission services cannot, by itself, reduce the
Commission's statutory authority to grant a CCN to that utility. (5)

 Appellees also argue that because a transmission-only utility, unlike one that also
provides distribution services, would generally not have a defined geographic area to which it
provided service, such a utility cannot obtain a CCN. Appellees rely on PURA section 37.151 to
support the district court's finding that a utility is obligated to service a specified, geographic area
in order to obtain a CCN. Section 37.151 provides that a certificate holder shall "serve every
consumer in the utility's certificated area" and "provide continuous and adequate service in that
area." Tex. Util. Code Ann. § 37.151 (West 2007). According to appellees, these requirements
constitute mandates that a utility have a certificated area. In contrast, under the Commission's
interpretation, section 37.151's requirements regarding the scope and quality of the service provided
are applicable only to the extent the certificate holder has a certificated area.

 "Construction of a statute by the administrative agency charged with its enforcement
is entitled to serious consideration, so long as the construction is reasonable and does not
contradict the plain language of the statute." Tarrant Appraisal Dist. v. Moore, 845 S.W.2d 820, 823
(Tex. 1993). Under the Commission's interpretation of PURA section 37.151, any utility that has
a certificated area--whether by obligation or at its discretion--must serve every customer and
provide adequate service therein, but a utility without a certificated area would not be subject to such
certificated-area-related requirements. Considering the plain language of section 37.151, we are
persuaded that the Commission's interpretation is reasonable. See Shumake, 199 S.W.3d at 284
(stating that legislative intent is discerned, when possible, from the plain meaning of the words
chosen in the statute). Section 37.151 does not state that a certificate holder shall have a certificated
area, or that it shall serve customers in a certificated area. See Tex. Util. Code Ann. § 37.151. 
Rather, section 37.151 provides that the certificate holder shall serve the customers in "the utility's
certificated area"--i.e. if the utility has a certificated area. See id.

 Interpreting section 37.151 not to provide an independent requirement that an
electric utility have a defined service area before being eligible for a CCN is consistent with
the distinction between transmission services and distribution services. Transmission services
involve the transportation of power at higher voltage. See 16 Tex. Admin. Code § 25.5(140), (144)
(2009). Distribution services involve carrying power from the transmission system to end users
over lower-voltage lines. See id. § 25.5(31), (33). While distribution services may be provided to
retail customers--the separately metered end-use customers who purchase and ultimately consume
electricity, see Tex. Util. Code Ann. § 31.002(16)--a retail customer cannot be a transmission
service customer. See 16 Tex. Admin. Code § 25.5(142). Instead, transmission service customers
include such entities as distribution service providers, municipally-owned utilities, retail electric
providers, and also other transmission service providers. See id. We find no expression of
legislative intent in the PURA that such customers of a particular transmission service provider be
limited to a particular geographic area, particularly since the PURA contemplates that transmission
service providers broadly offer "wholesale transmission services within ERCOT." See Tex. Util.
Code Ann. § 35.004(d) (West 2007). Therefore, we consider it a reasonable interpretation of the
PURA that section 37.151 does not require a transmission-only utility to have a service area, but
instead requires simply that utilities that do have a service area--as would be the case, for example,
with a utility that provides distribution services to retail customers, see id. § 37.051(b)--comply with
certain mandates within that service area.

 Appellees also refer to PURA section 37.056 to argue that an electric utility
must have a service area to obtain a CCN. Section 37.056 sets out factors that the Commission is
to consider in determining whether to grant a CCN. See id. § 37.056(c). These factors include
"the effect of granting the certificate on the recipient of the certificate and any electric utility serving
the proximate area" and "the probable improvement of service or lowering of cost to consumers
in the area if the certificate is granted." See id. § 37.056(c)(3), (4)(E). However, neither factor
specifically refers to a "service area" or a "certificated area." In Hammack v. Public Utility
Commission, the Commission had granted a CCN for the construction of a transmission line and,
in doing so, had stated that "the focus should not be limited to the needs of an isolated geographic
area, but instead should consider the needs of the interconnected statewide transmission systems." 
131 S.W.3d 713, 722 (Tex. App.--Austin 2004, pet. denied). This Court held that, in light of the
applicable statutory scheme, the Commission did not improperly apply PURA section 37.056 in
taking into account such statewide considerations. See id. at 724. This suggests, then, that when
granting a CCN under section 37.056 to a utility providing transmission services, the "proximate
area" under consideration is not limited to the particular geographic area in which the transmission
facility is located, even if the utility provides distribution services to a certificated area. It follows
that section 37.056 does not support appellees' position that a transmission-only utility cannot be
certified without a defined service area. Consequently, we hold that the Commission has been
conferred power under the PURA to grant a CCN to a transmission-only utility that does not have
a certificated service area. (6)

 We note that both sides have argued that their positions are supported by policy
considerations. Appellants contend that if only TDUs certificated to provide distribution services
are able to provide transmission services, the Commission will be unable to carry out its legislative
mandate to increase the statewide, renewable energy technology generating capacity. See generally
Tex. Util. Code Ann. § 39.904 (West Supp. 2009). Appellees counter that there are "more than
enough" existing, certificated TDUs that are "ready, willing and able" to provide all of the
transmission needed to satisfy the state's renewable energy goals. A number of amici curiae,
including wind generation developers and transmission-only utilities without service areas that have
applied for CCNs from the Commission, have also filed briefs, arguing on the side of appellants.

 We do not express an opinion on the policy considerations expressed by the parties
and the various amici curiae, however, because the Texas Legislature has spoken to the issue by
enacting House Bill 3309 during the 2009 regular session. As to the issue of whether a transmission-only utility can obtain a CCN, the following subsection (d) was added to PURA section 37.051: "A
certificate may be granted to an electric utility or other person under this section for a facility used
as part of the transmission system serving the ERCOT power region solely for the transmission of
electricity." Act of May 31, 2009, 81st Leg., R.S., ch. 1170, § 2, 2009 Tex. Gen. Laws 3702, 3703
(codified at Tex. Util. Code Ann. § 37.051(d) (West Supp. 2009)). Furthermore, as to whether such
a utility can obtain a CCN when it has no specific certificated area, the following italicized language
was added to PURA section 37.151:


 Except as provided by this section, Section 37.152, and Section 37.153, a certificate
holder, other than one granted a certificate under Section 37.051(d), shall:


 (1) serve every consumer in the utility's certificated area; and


 (2) provide continuous and adequate service in that area.


Id. § 4 (codified at Tex. Util. Code Ann. § 37.151 (West Supp. 2009)). The Texas Legislature has
clarified, therefore, that an electric utility intending to operate a facility that is part of the
transmission system serving the ERCOT power region may obtain a CCN even if the utility will
provide only transmission services and will not satisfy section 37.151's certificated-area-related
requirements. (7)

 We conclude that the district court erred in holding that the Commission exceeded
its statutory authority in granting a CCN to "a transmission-only utility without a service area." The
PURA authorizes the Commission to grant a CCN to an electric utility that provides only
transmission services and that does not have a certificated area in which such services will be
provided. See Tex. Util. Code Ann. §§ 31.002(6), 37.056(a), .154(a).


Transfer of CCN under PURA Section 37.154

 Appellants also argue that the district court erred in holding that the Commission's
granting a CCN to ETT under section 37.154 was improper. On this issue, appellants challenge
paragraphs (2), (3), and (4) of the district court's judgment.


 Transferee with no pre-existing CCN

 The district court, in paragraph (2) of its judgment, found that the Commission
"exceeded its statutory authority by granting [ETT] a [CCN] pursuant to [PURA] § 37.154 . . .
instead of analyzing the request for a CCN pursuant to PURA §§ 37.051 and 37.056, the relevant
statutes." Appellants contend that the Commission correctly determined that PURA section 37.154
was the proper statute for granting the CCN requested by ETT in its application.

 An electric utility may not directly or indirectly provide service to the public under a
franchise or permit unless the utility first obtains a CCN from the Commission. See id. § 37.051(a). 
ETT sought to become an electric utility and obtain a CCN not by installing or operating a new
service, but by acquiring and operating transmission equipment already constructed by TCC under
an existing CCN. PURA section 37.154 governs transfers of CCNs and transfers of rights obtained
under a CCN. Section 37.154 provides that "[a]n electric utility may sell, assign, or lease a
certificate or a right obtained under a certificate if the commission determines that the purchaser,
assignee, or lessee can provide adequate service." Id. § 37.154(a). (8) Thus, the focus is on the ability
of the transferee to provide adequate service, not on the necessity for the service itself. See id. 
PURA section 14.101 provides additional requirements regarding transfers that exceed certain
thresholds. See id. § 14.101. In certain cases, the Commission must determine whether the
transaction is consistent with the public interest, and may disallow the transaction if it will
unreasonably affect rates or service. See id. § 14.101(b), (c). Under both sections 37.154 and
14.101, there is no necessity requirement applied to the services permitted under the transferred
certificate, to the transfer itself, or to the transferee being the party providing the services. See id.
§§ 14.101, 37.154. Instead, the focus is on whether services will continue to be adequately provided
following the transfer. See id. §§ 14.101(c), 37.154(a).

 The determination of whether the services provided under a CCN are necessary is
made when the CCN is initially obtained, or when additional services are added to the existing CCN. 
See, e.g., Dunn v. Public Util. Comm'n, 246 S.W.3d 788, 790-91 (Tex. App.--Austin 2008, no pet.)
(extension of service under existing CCN); Public Util. Comm'n v. Texland Elec. Co., 701 S.W.2d
261, 263, 265-66 (Tex. App.--Austin 1985, writ ref'd n.r.e.) (appellee's application for new CCN). 
This determination is made under PURA section 37.056. See Dunn, 246 S.W.3d at 791-92;
Texland Elec. Co., 701 S.W.2d at 266. Section 37.056 sets out the considerations by which
the Commission determines whether to "grant" a CCN. See Tex. Util. Code Ann. § 37.056. The
provisions of section 37.056 indicate that its focus is on new services, not new providers of a service. 
See id. (9) Thus, we are convinced that the Commission's interpretation, that when a transfer occurs
in which no new services are contemplated there is no need to comply with section 37.056, is
reasonable. No determination need be made regarding the necessity of existing services, because
such determination would have already been made by the Commission in order for the transferor to
have obtained its CCN in the first place. A CCN does not need to be "re-granted"--in accordance
with the requirements of section 37.056--when all rights to be obtained by the transferee have
already been approved by the Commission in connection with the transferor's preexisting CCN. (10)

 Appellees contend that a transferee cannot obtain by transfer a CCN or rights
obtained under the CCN unless the transferee already possesses its own CCN. Section 37.154
contains no such requirement, but instead refers to the transferee generally as "the purchaser,
assignee, or lessee." See id. § 37.154(a). Appellees point to the requirement in section 37.051 that
the utility obtain a CCN "from the commission." See id. § 37.051(a). However, under the plain
language of section 37.154, for a transfer to take place the Commission must provide its approval. 
See id. § 37.154(a). We consider such Commission action to be sufficient to satisfy section 37.051's
requirement that a utility obtain a CCN from the Commission. Otherwise, under appellees'
interpretation, no new utility could enter the market by purchasing existing service. It would have
to wait until a need for new service arose somewhere, and then obtain a new CCN directly from the
Commission to provide that service.

 Appellees also assert that to grant a CCN to a utility, the Commission must determine
not only that the service is necessary, but that the utility itself is necessary to provide such service. 
Appellees conclude, based on this assertion, that ETT would need to satisfy section 37.056 in
this case because the Commission has not yet determined that there is a public need for ETT. 
However, appellees provide no authority for their assertion. Under section 37.051, to obtain a CCN,
public convenience and necessity must require "the installation, operation, or extension of the
service," not the utility itself. See id. § 37.051(a). Likewise, section 37.056 requires that "the
certificate," rather than the utility itself, be found necessary. See id. § 37.056(a). While a review
under section 37.056 of the service to be provided under the CCN would presumably encompass
whether the utility seeking the CCN could adequately provide that service, see id. § 37.056(c)(4)(E),
this concern is in fact addressed in section 37.154(a), because in order to approve a transfer the
Commission must determine that the transferee "can provide adequate service," see id. § 37.154(a).

 Therefore, we affirm the Commission's conclusion that when a CCN or rights
obtained thereunder are transferred in accordance with PURA section 37.154, and no additional
service is to be installed, operated, or extended in connection with such transfer, the requirements
of PURA section 37.056 do not apply. Instead, the transfer must satisfy section 37.154 and, if
applicable, the additional statutory restrictions under section 14.101. See id. §§ 14.101, 37.154; see
also Cities of Austin v. Southwestern Bell Tel. Co., 92 S.W.3d 434, 441-42 (Tex. 2002) ("[W]e give
weight to how the PUC interprets its own powers, but only if that interpretation is reasonable and
not inconsistent with the statute.").


 Due process considerations

 The district court, in paragraph (3) of its judgment, found that the Commission
"violated the Plaintiffs' due process rights when it granted ETT a CCN based on PURA § 37.154
when such basis was not pled or raised by the [Commission] or ETT until after the close of evidence
below." In its application with the Commission, ETT did not cite section 37.154 of the PURA. ETT
did not categorize its application as requesting a transfer under section 37.154 until its initial post-hearing brief.

 In order to raise in the district court a complaint of denial of due process by the
Commission, appellees were required to raise the complaint in their motions for rehearing before the
Commission. See Gonzalez v. Texas Educ. Agency, 882 S.W.2d 526, 528 (Tex. App.--Austin 1994,
no writ). A motion for rehearing must be sufficiently definite to apprise the agency of the error
claimed and to allow the agency opportunity to correct or otherwise address the error. See Suburban
Util. Corp. v. Public Util. Comm'n, 652 S.W.2d 358, 365 (Tex. 1983); Entergy Gulf States, Inc.
v. Public Util. Comm'n, 173 S.W.3d 199, 210 (Tex. App.--Austin 2005, pet. denied). We find no
reference, in the Cities' and TIEC's motions for rehearing, to their right to due process or ETT's
failure to plead or raise PURA section 37.154. Appellees argue that the State sufficiently raised the
issue of due process in the following language of its motion for rehearing:


 Instead of making a principled decision pursuant to PURA §§ 37.051 and 37.056, the
Commission through its Order apparently intends to approve the transfer of a portion
of TCC's rights under its own certificate to ETT. . . .


 . . . . Nothing in [§ 37.154] implies that TCC (or any other utility) may be permitted
to transfer a portion of its rights to a non-certificated entity such as ETT, or that the
mere transfer (or purported transfer) of TCC's rights under its own certificate can
somehow create a new certificated utility within the meaning of PURA § 37.051. 
The Commission's decision, made without reference to any guiding principles of law,
is thus arbitrary and capricious and an abuse of discretion.


 This language does not sufficiently identify appellees' right to due process or ETT's
failure to plead or raise PURA section 37.154. The motion for rehearing apprised the Commission
of the State's allegation that PURA section 37.154 does not authorize the Commission's decision,
but did not sufficiently apprise the Commission that the State was alleging surprise or harm from
the very fact that section 37.154 was even considered by the Commission. By failing to raise a
due process issue in their motions for rehearing, appellees waived the issue. See Gonzalez,
882 S.W.2d at 528. The district court's finding that the Commission violated appellees' rights to
due process was, therefore, error.


 Commission's subject-matter jurisdiction

 The district court found, in paragraph (4) of its judgment, that the Commission
"lacked subject matter jurisdiction by granting ETT a CCN based on PURA § 37.154 while
accepting jurisdiction over the case based on different statutes, PURA §§ 37.051 and 37.056." In
its application with the Commission, ETT asserted that the Commission "has jurisdiction over
this application under §§ 14.101, 35.004, 36.001, and 37.056 of PURA." The Commission, in turn,
included a conclusion of law in its final order stating, "The Commission has jurisdiction over ETT,
TCC and the subject matter of its application under PURA §§ 14.101, 35.004, 36.001 and 37.056."

 Appellees contend that because ETT did not cite PURA section 37.154 in its
application's statement of jurisdiction and the Commission never specifically "took" jurisdiction
pursuant to section 37.154, the Commission did not have jurisdiction to grant a transfer under
section 37.154. As with appellees' complaint of denial of due process, appellees failed to raise the
issue of lack of subject-matter jurisdiction before the Commission. However, failure to exhaust
administrative remedies does not bar judicial review when the error alleged is that the agency acted
without subject-matter jurisdiction. See City of Sherman v. Public Util. Comm'n, 643 S.W.2d 681,
683 (Tex. 1983).

 The parties do not dispute that the Commission has jurisdiction to approve the
transfer of a CCN or rights obtained thereunder pursuant to PURA section 37.154. See Tex. Util.
Code Ann. § 37.154. The question is whether the failure to cite section 37.154 by ETT in the
statement of jurisdiction in its application for a CCN, or by the Commission in its conclusion of law
regarding its jurisdiction, results in the Commission lacking jurisdiction to act under that section. 
Appellees cite no authority holding that the omission of a reference to a statute from an application's
statement of jurisdiction results in a bar against any action taken by the applicable agency under that
statute. To the contrary, under the Commission's rules:


When issues not raised by the pleadings are tried or otherwise heard or argued at
hearing by express or implied consent of the parties, upon a determination by the
presiding officer that no prejudice to any of the parties will occur, the issues shall be
treated in all respects as if they had been raised in the pleadings.


16 Tex. Admin. Code § 22.76(b) (2009). ETT's application described the proposed transfer
of transmission facilities from TCC to ETT, and requested a CCN in accordance with PURA
section 37.051(a) so that ETT could operate such facilities. Moreover, the administrative record
reflects that, while section 37.154 was not referenced in ETT's application, the parties argued the
applicability of section 37.154 and appellees did not allege any prejudice resulting from the
Commission's consideration of the statute. Under these circumstances, we decline to hold that the
Commission had no jurisdiction over a section 37.154 transfer based only on ETT's failure to cite
section 37.154 in its application's statement of jurisdiction.

 In the same way, we conclude that the absence of a reference to section 37.154 in the
Commission's conclusion of law regarding jurisdiction, by itself, does not deprive the Commission
of jurisdiction to act pursuant to that section. Again, appellees have cited no authority that would
support a conclusion to the contrary. We are not to subject an agency's order to a "hypertechnical"
standard of review. See State Banking Bd. v. Allied Bank Marble Falls, 748 S.W.2d 447, 448-49
(Tex. 1988); Gene Hamon Ford, Inc. v. David McDavid Nissan, Inc., 997 S.W.2d 298, 310-12
(Tex. App.--Austin 1999, pet. denied). The Commission's order includes a finding of fact that
"ETT can provide adequate service in accordance with PURA § 37.154," a conclusion of law that
TCC's sale and assignment of its right under the existing CCN is "granted because ETT can provide
adequate service," and an ordering paragraph granting ETT a CCN "by transfer of rights." Thus, the
Commission's order, as a whole, expressly contemplates the exercise of its jurisdiction in approving
a transfer pursuant to section 37.154 of the PURA. To find jurisdiction lacking based solely on the
absence of a reference to section 37.154 in the single conclusion of law regarding the Commission's
jurisdiction would require us to apply the type of "hypertechnical" review that this Court has found
improper. See Gene Hamon Ford, 997 S.W.2d at 312.

 Therefore, the Commission properly construed and applied PURA section 37.154. 
We hold that the Commission is authorized to transfer a CCN or rights obtained thereunder pursuant
to section 37.154 without considering the section 37.056 factors as to the CCN or rights being
transferred or requiring the transferee to possess a CCN prior to the transfer. We also hold that the
Commission's transfer to ETT of rights and facilities held by TCC pursuant to section 37.154 was
not an action taken without subject-matter jurisdiction, and that whether such transfer violated
appellees' rights to due process was not an issue properly preserved for judicial review.



Substantial Evidence Review

 Appellees' pleadings include a claim that the Commission's determination that ETT's
formation transactions complied with PURA section 14.101 is not supported by substantial evidence. 
Based on the district court's findings in paragraphs (2) through (5) of its judgment, the court reversed
the Commission's approval of ETT's application and deemed it unnecessary to perform the
requested substantial evidence review. In the preceding sections of this opinion, we have concluded
that paragraphs (2) through (5) of the district court's judgment were error. As a result, appellants'
claim that substantial evidence does not support the Commission's determination that ETT's
formation transactions complied with PURA section 14.101 is ripe for consideration.

 Appellees contend that remand to the district court is the proper course, so that
the district court may perform the substantial evidence review that is required by the applicable
claim in appellees' pleadings. However, whether substantial evidence supports an administrative
agency's decision is a question of law. See Texas Dep't of Pub. Safety v. Alford, 209 S.W.3d
101, 103 (Tex. 2006). Therefore, had the district court ruled on this claim in its judgment, its
ruling would be entitled to no deference on appeal. See id. Also, no evidence in addition to the
administrative record is required. "When reversing a trial court's judgment, the court must render
the judgment that the trial court should have rendered, except when: (a) a remand is necessary for
further proceedings; or (b) the interests of justice require a remand for another trial." Tex. R. App.
P. 43.3. Given that the issue not decided by the district court is a question of law, we consider
remand to the district court to be unnecessary, and we will rule on the issue so that we may render
the judgment that the district court should have rendered.

 Judicial review of a final order of the Commission generally is under the substantial
evidence standard of review. See Tex. Util. Code Ann. § 15.001 (West 2007). We presume that
the Commission's findings are supported by substantial evidence, and appellees have the burden
to demonstrate otherwise. See ASAP Paging, Inc. v. Public Util. Comm'n, 213 S.W.3d 380, 392
(Tex. App.--Austin 2006, pet. denied). Substantial evidence requires only more than a mere
scintilla, and the evidence on the record actually may preponderate against the agency's decision and
nonetheless amount to substantial evidence. Railroad Comm'n v. Torch Operating Co., 912 S.W.2d
790, 792-93 (Tex. 1995). We may not substitute our judgment for that of the agency on the weight
of the evidence. ASAP Paging, 213 S.W.3d at 392. The test is not whether in our view the agency
reached the correct conclusion but whether some reasonable basis exists in the record for the
agency's action. Id. at 393.

 The parties agree that the following provisions of PURA section 14.101 applied to
the transfer of TCC's initial facilities to ETT, and to the transfer of ownership interests in ETT:


 [T]he commission shall investigate the transaction, with or without a public hearing,
to determine whether the action is consistent with the public interest. In reaching its
determination, the commission shall consider:

 

 (1) the reasonable value of the property, facilities, or securities to be acquired,
disposed of, merged, transferred, or consolidated;

 

 (2) whether the transaction will:

 

 (A) adversely affect the health or safety of customers or employees;

 

 (B) result in the transfer of jobs of citizens of this state to workers domiciled
outside this state; or

 

 (C) result in the decline of service;

 (3) whether the public utility will receive consideration equal to the reasonable value
of the assets when it sells, leases, or transfers assets; and

 

 (4) whether the transaction is consistent with the public interest.


Tex. Util. Code Ann. § 14.101(b).

 At the district court, only the State argued that substantial evidence did not
support the Commission's determination that ETT's formation transactions complied with PURA
section 14.101. The State argued that the transfer of assets would provide no improvement of
service, and yet would result in rate case expenses charged to customers that would not have been
incurred if TCC had retained the assets. For instance, according to the State, if TCC had retained
the assets and placed the equipment in its own rate base, the ratemaking proceeding would not have
included expenses for litigating the issues of whether ETT could obtain a CCN in accordance with
PURA section 37.154 and whether the proposed transactions should be approved in accordance with
PURA section 14.101.

 We find that substantial evidence supports the Commission's findings. The
Commission issued findings of fact to the effect that it considered subsection (1) of
section 14.101(b), and that the transaction at issue satisfied subsections (2) and (3). Appellees have
not challenged these findings. Instead, the State focused only on whether costs exceeded benefits
and thus, according to the State, the transaction failed the "public interest" considerations of
subsection (4) of PURA section 14.101(b). Regarding the costs applicable to the transaction, the
Commission determined that ETT's return on equity would not be higher than that of TCC, that
ETT's incremental cost of debt would be comparable to that of TCC to construct the same facilities,
and that the costs associated with ETT's operation of the facilities were comparable to the costs for
TCC to do so.

 These findings were supported by testimony by ETT witnesses. According to one
ETT witness, for instance, ETT's requested return on equity was the same as that requested in TCC's
pending rate case. Similarly, an ETT witness testified regarding ETT's comparable cost of debt
based on its current credit rating. Moreover, after the Commission expressed concern that recovery
of formation expenses would not be consistent with the public interest, ETT agreed to withdraw
its request for recovery of such expenses. Regarding benefits applicable to the transaction, upon
completion of the transaction, ETT would apply to become a participant in the Commission's
ongoing competitive renewable energy zone process, with the intention of promoting long-term
planning and innovative transmission technology for ERCOT, the state-wide transmission grid. See
Tex. Util. Code Ann. § 39.904(g) (West Supp. 2009). ETT was already a participant in that docket. 
Also, MidAmerican was to make an initial $15 million investment. While the State characterized
the potential for further equity investment in ETT as speculative, ETT presented evidence that
substantial future investment was likely. According to ETT testimony, the combination of both
American Electric Power's and MidAmerican's technical and financial resources would enable ETT
to evaluate and pursue transmission services in ERCOT on a larger geographic and financial scale
than TCC would on its own. In addressing the benefit-cost analysis, ETT testimony characterized
the transaction as one that "doesn't have downside but has significant upside potential."

 Thus, for purposes of a substantial evidence review, there is sufficient evidence in
the administrative record to the effect that the consideration for ETT's formation transactions was
equal to the reasonable value of the assets transferred, that approval of the transaction would not
adversely affect the health or safety of customers or employees, result in the transfer of jobs outside
the state, or result in the decline of service, that return on equity, incremental cost of debt, and
operational costs were comparable as between TCC and ETT, and that approval of ETT's application
would be beneficial given the growing need for transmission of electricity in the state. We,
therefore, conclude that substantial evidence supports the determination of the Commission that
ETT's formation transactions satisfied the "public interest" factors of PURA section 14.101(b). 
ASAP Paging, 213 S.W.3d at 392.


Ratemaking Proceeding Expenses

 The district court, in paragraph (6) of its judgment, found that the Commission
"exceeded its statutory authority in denying the City Plaintiffs any of their reasonable rate case
expenses pursuant to PURA § 33.023." The court remanded the matter to the Commission "for a
determination and award of the Cities' reasonable rate case expenses, if any, pursuant to PURA
§ 33.023." In a separate point on appeal, the Commission argues that its conclusion that the Cities
were not entitled to recover expenses in the proceeding should be affirmed on review.

 Section 33.023 of the PURA contemplates that municipalities may incur expenses
in connection with a ratemaking proceeding, and provides for reimbursement for such expenses.


 (a) The governing body of a municipality participating in or conducting a ratemaking
proceeding may engage rate consultants, accountants, auditors, attorneys, and
engineers to:

 

 (1) conduct investigations, present evidence, and advise and represent the
governing body; and

 (2) assist the governing body with litigation in an electric utility ratemaking
proceeding before the governing body, a regulatory authority, or a court.

 

 (b) The electric utility in the ratemaking proceeding shall reimburse the governing
body of the municipality for the reasonable cost of the services of a person engaged
under Subsection (a) to the extent the applicable regulatory authority determines is
reasonable.



Tex. Util. Code Ann. § 33.023 (West 2007). There is no dispute that ETT is an electric utility, and
that the Cities incurred some expenses in obtaining the types of services described by PURA
section 33.023(a). Nonetheless, the Commission contends it was justified in determining that the
Cities were not entitled to reimbursement of any such expenses.

 In addition to a conclusion of law that the Cities were not entitled to recover their
expenses, in the "Discussion" portion of its final order the Commission stated the following with
regard to the reimbursement of the Cities' expenses:


 Also at the September 13, 2007 open meeting, the Commission addressed the
issue raised by Staff regarding Cities' rate case expenses. Although Cities urge
that they are entitled to rate case expense reimbursement under PURA § 33.023,
Staff contend that chapter 33 of PURA does not allow reimbursement of Cities'
rate case expenses in a wholesale-only docket such as ETT's. The Commission
requested additional information from Cities regarding the extent to which the
rate case expenses requested by Cities were attributable to the rate case component,
the sale/merger/transfer component, or the CCN component of this docket. On
September 28, 2007, Cities filed a letter that reiterated Cities' contention that all of
the Cities' efforts in this proceeding have been related to ETT's ability to collect
rates from the Cities and their citizenry. The Commission is persuaded by Staff's
arguments, including the conclusion that PURA § 33.023 applies only to rate cases
where rates for retail services within the city are set, and that cities have no
jurisdiction to set wholesale transmission rates. Therefore, Cities are entitled to
recover none of their requested rate case expenses in this docket.


The Commission Staff had conceded that the Cities and their residents will ultimately pay some of
ETT's costs through its rates, but took the position before the Commission that the Cities' request
for recovery of expenses should be denied because PURA section 33.023 "does not apply to these
expenses." According to the Commission's order, the Commission based its determination on
the Staff's arguments that PURA section 33.023 applies only to rate cases in which rates for
retail services within the municipality are set, not those in which only wholesale transmission rates
are set, and that municipalities have no jurisdiction to set wholesale transmission rates.

 The Commission's construction of PURA section 33.023 is entitled to serious
consideration, so long as the construction is reasonable and does not contradict the plain language
of the statute. Tarrant Appraisal Dist., 845 S.W.2d at 823. Thus, we look to the plain language of
the statute. While section 33.023 limits reimbursement to certain types of services, see Tex. Util.
Code Ann. § 33.023(a), and to costs that are determined reasonable, see id. § 33.023(b), the only
restriction concerning the municipality itself is that it be "participating in or conducting a ratemaking
proceeding," see id. § 33.023(a). Cf. Southwestern Bell Tel. Co. v. Public Util. Comm'n, 31 S.W.3d
631, 641 (Tex. App.--Austin 2000) ("[The telecommunications utility] is required to reimburse
Cities for their attorney's fees incurred if these proceedings are deemed 'ratemaking proceedings'
and if the Commission finds that the costs are reasonable."), aff'd, 92 S.W.3d 434 (Tex. 2002).

 The Commission in its order set ETT's rates. Thus, the proceeding below was a
ratemaking proceeding. See Tex. Util. Code Ann. § 11.003(17) (West 2007) (ratemaking proceeding
is "proceeding in which a rate is changed"); Southwestern Pub. Serv. Co. v. Public Util. Comm'n,
962 S.W.2d 207, 219-20 (Tex. App.--Austin 1998, pet. denied) (ratemaking proceeding is one
that directly results in changed rates to customers). (11) In addition, there can be no dispute that the
Cities were participating in the proceeding. Section 33.025 provides that a municipality has standing
in "each case before the commission that relates to an electric utility providing service in the
municipality." See Tex. Util. Code Ann. § 33.025(a) (West 2007). The Commission determined
that the Cities had standing to participate, and granted their motion to intervene. Moreover, in
arguing to the Commission that the Cities' expenses could not be reimbursed, the Commission Staff
conceded that the determination on the Cities' standing was correct. Based on the plain language
of section 33.023, the Cities were potentially eligible to receive reimbursement to the extent
that, under subsection (a), the applicable services were the correct types of services and, under
subsection (b), the costs were reasonable in accordance with the Commission's determination. See
id. § 33.023.

 The Commission based its determination that reimbursement was not allowed on
the Staff's arguments that municipalities have no jurisdiction to set wholesale transmission rates
and that section 33.023 does not apply to rate cases in which only wholesale transmission rates
are set. The Staff, in turn, had based both those arguments on provisions of the PURA that address
a municipality's jurisdiction over an electric utility's rates, operations, and services. See id.
§ 33.001(a) (West 2007) (providing for circumstances in which governing body of municipality has
exclusive original jurisdiction), § 33.004(a) (West 2007) (setting out impact of municipality's
decision not to surrender jurisdiction to Commission), § 35.004 (West 2007) (providing for
Commission's authority over utility providing wholesale transmission service within ERCOT). 
However, section 33.023 contains no language that would limit its applicability depending on
whether the Commission or the utility does or does not have jurisdiction--exclusive, original, or
otherwise. See id. § 33.023. Nor does section 33.023 contain any language limiting its applicability
to only certain types of rates. Rather, section 33.023 requires only that the municipality be
"participating in or conducting" the ratemaking proceeding. See id. This requirement was met here.

 PURA section 33.023 authorizes the Commission to require an electric utility to
reimburse certain expenses incurred by the governing body of a municipality participating in or
conducting the utility's ratemaking proceeding. See id. The Commission's conclusion that
section 33.023 does not apply to expenses incurred in a docket in which only wholesale transmission
rates are set is contrary to the plain language of the statute.

 The Commission contends that we can affirm its denial of the Cities' reimbursement
request because the Cities failed to segregate between their expenses incurred in connection with
the "rate case component" of the docket and their expenses incurred in connection with the
other components of the docket. Alternatively, the Commission contends that we can affirm its
denial of the Cities' reimbursement request based on reimbursement being inappropriate in this
proceeding given that costs will be divided among the entire ERCOT. However, section 33.023 of
the PURA requires that the Commission make the determination of reasonableness. See id.
§ 33.023(b). It is clear from the Commission's order that no such determination was made in this
case. Instead, the Commission incorrectly considered itself prohibited by statute from authorizing
any reimbursement of expenses.

 We hold that the district court correctly remanded the case to the Commission for a
new determination pursuant to PURA section 33.023 of whether the Cities should be reimbursed
any amount as reasonable expenses. See Texas Dep't of Transp. v. T. Brown Constructors, Inc.,
947 S.W.2d 655, 659 (Tex. App.--Austin 1997, pet. denied) ("Although courts have authority
to hold that an agency erred and must correct its error, courts cannot dictate how to correct the
error if, by doing so, the court effectively usurps the authority and discretion delegated to the agency
by the legislature."). We do not hold that the Commission is required to grant the Cities' request
for reimbursement. We recognize the possibility that the Commission may determine it to be
unreasonable to reimburse--entirely or partially--the Cities in this case based on a distinction
between expenses incurred in connection with the rate case component of the case and expenses
incurred in connection with the other components of the case. Similarly, we recognize the possibility
that the Commission may determine it unreasonable to reimburse--entirely or partially--the Cities
in this case based on wholesale transmission costs being spread across all of ERCOT and the
impact on municipal customers being more attenuated as a result. We express no opinion as to the
reasonableness of either such determination. Our holding is that the Commission was not prohibited
as a matter of law from ordering reimbursement of the Cities' expenses. Because the Commission
based its refusal to reimburse the Cities' expenses on its incorrect statutory interpretation that it was
so prohibited, we believe that remand to the Commission on the reimbursement issue is appropriate
for the Commission to reconsider the matter. See Texas Citizens for a Safe Future & Clean Water
v. Railroad Comm'n, 254 S.W.3d 492, 502-03 (Tex. App.--Austin 2007, pet. filed) (remanding
case to Commission because it had incorrectly considered itself prohibited from considering certain
aspects of the "public interest"). Upon remand, the Commission must make a determination as
required by PURA section 33.023.

Conclusion

 The Commission erred in determining that it was prohibited from granting
the Cities' request for reimbursement of their ratemaking proceeding expenses. Therefore, we
affirm the judgment of the district court as to its remand of the case to the Commission for
its reconsideration of whether to reimburse the Cities for their expenses. As to the remainder of
appellees' claims, we find no error in the Commission's final order. Consequently, we reverse
the judgment of the district court that the Commission erred in granting a CCN to ETT, and we
render judgment that the Commission's final order is affirmed in all respects other than its denial of
the Cities' recovery of expenses incurred in the ratemaking proceeding.


The Dissent

 Unfortunately, due to the nature of the dissent, we are forced to respond to entirely
unfounded allegations that have no bearing on the legal issues presented in this case and have
not been raised by the parties. It is our view that the dissent serves no legitimate or productive
jurisprudential purpose with respect to the process of hearing and deciding this case. It is with
great reticence and our apologies to the parties that we engage in this time-consuming and
wasteful exercise.

 We begin our discussion with the most fundamental problem--the "dissent" is not,
in fact, a dissent to the disposition of the case. The dissent fails to express any opinion on the
proper disposition of the case, ignoring the most basic obligation of a judge under the Code of
Judicial Conduct, which is to "hear and decide matters assigned to the judge except those in which
disqualification is required or recusal is appropriate." Tex. Code Jud. Conduct, Canon 3(B)(1),
reprinted in Tex. Gov't Code Ann., tit. 2, subtit. G app. B (West 2005). Indeed, the dissenting judge
pointedly declines to address the merits or express an opinion regarding the appropriate disposition
of the case. Instead, the writing is a dissent to the procedure followed by this Court when a judge
previously assigned to this case recused himself before the case was decided. (12)

 The dissenting judge may disagree with the procedure followed by this Court to
reconstitute a three-judge panel when one of the judges becomes unavailable. She may express that
disagreement in a written opinion. However, the expression of this disagreement does not, by itself,
satisfy her obligation to fulfill her duties as a panelist with respect to the disposition of the case. It
is one thing to disagree with whether this Court followed the correct procedure in assigning a new
judge to the panel when there was a recusal. It is another to refuse--as an assigned panelist--to
decide the case. (13)

 An assigned judge may disagree with any number of procedural rulings made by the
court--such as the decision to grant or deny oral argument, the decision to grant or deny an extension
to file a brief, or even a decision to grant or deny a motion to dismiss on procedural grounds--and
still fulfill his obligation to hear and decide the case. Indeed, there are many decisions in the course
of an appeal, ranging from relatively minor to potentially dispositive, that a judge might disagree
with and even dissent to, and yet go on to decide the case. (14) The "dissent" here is not an opinion
dissenting to the disposition of the case as determined by the majority. Rather, it is an expression
of the dissenting judge's refusal to participate in the decision of the case at all due to her
disagreement with the procedure for reconstituting the panel after the recusal.

 This sort of refusal to participate in deciding a case while continuing as an
assigned panelist is not allowed by the Code of Judicial Conduct. Canon 3(B)(1) of the Code of
Judicial Conduct expressly provides: "A judge shall hear and decide matters assigned to the
judge except those in which disqualification is required or recusal is appropriate." Id. The
dissenting judge has neither disqualified herself nor recused herself. Therefore, pursuant to
Canon 3(B)(1), she is obligated to decide the case. It is not an option for an assigned judge to
declare, "I disagree with the way the court reconstituted the panel after a recusal, and therefore, I
will remain on the case as an assigned judge, but I will not actually participate in deciding the case." 
Continuing as a panelist, but refusing to participate in the decision, is not a permissible course
of action.

 The dissent also argues that she must remain on the panel and refuse to decide
the case to preserve the parties' potential remedies to seek recusal, curiously, of her. Neither the
rules relating to recusal nor the canons governing judicial conduct allow such a stance. If conflicted
or subject to recusal, the dissenting judge must recuse. If not conflicted or subject to recusal, but
worried that the parties might be concerned about it, the judge must put the parties on notice
and allow them an opportunity to waive the issue before the decision is made in the case. (15) If not
conflicted or subject to recusal and not concerned that the parties might think so, the judge
must decide the case. No other options are allowed. It is not an option to remain on the panel and
declare "I abstain from deciding this case because I think I may be conflicted or somehow tainted
by another judge."

 The effect of the dissent's position is to reduce--de facto--the participating panel
in this case to two judges. The parties have an assigned panel of three judges as provided for in
the rules of appellate procedure, but they only have the benefit of the opinions of two of those
judges on the merits of the case. They will rightly ask, "Why?" The dissent's answer is that she is
so troubled by sitting on this panel after Justice Pemberton voluntarily recused himself that
she cannot even express an opinion on or adjudicate the case. She tells us that she is "conflicted"
or somehow no longer "neutral" or "untainted" due to the fact that she heard oral argument with a
judge who expressed a preliminary, tentative vote in the case after hearing oral argument, and
later recused himself. If the dissenting judge honestly believes she is somehow "conflicted," "not
neutral," or no longer "untainted" (to use a term adopted by the dissent, although its legal relevance
to this area of the law is not apparent) by her contact with the recused judge to the point that it
prevents her from performing her judicial duty to decide the case, she is obligated to recuse herself
and not serve on the panel. She should not remain as an assigned judge. If she is not "conflicted"
or "tainted," she is obligated to serve on the panel and decide the case. She has done neither.

 For her core idea that a judge who discovers a ground for recusal after hearing
oral argument somehow "taints" the other judges assigned to the panel, thus necessitating a
new panel, the dissent cites to no authority--Texas, federal, secondary, or otherwise--and simply
ignores the fact that Texas has a rule of appellate procedure that directly governs this situation. 
Texas Rule of Appellate Procedure 41.1(b) expressly sets out the procedure to follow in instances
where an assigned judge cannot participate after a case has been argued. Rule 41.1(b) states that
"[a]fter argument, if for any reason a member of the panel cannot participate in deciding a case,
the case may be decided by the two remaining justices," or if the two justices cannot agree, the
chief justice may "designate another justice of the court to sit on the panel to consider the case." 
Tex. R. App. P. 41.1(b).

 That is precisely what happened here. From a purely legal standpoint, the
reconstitution of the panel under these circumstances is the same when a panelist becomes
unavailable for any reason. See id. Plainly, Rule 41.1 contemplates that assigned judges do not
necessarily become ineligible to decide a case simply by the presence of a panelist at oral argument
who later recuses himself, or the participation of a panelist before the case is decided who ultimately
does not participate in the decision due to a recusal or for any other reason.

 The dissent does not argue that Rule 41.1's mandatory procedure was not followed
here. Instead, the dissent argues that "justice requires" a different practice in these situations and that
it is somehow a denial of due process not to follow her preferred--and as yet unadopted--procedure. 
However, this is a matter for the dissenting justice to take up with the Texas Supreme Court
Rules Advisory Committee. Regardless of what the individual appellate judges on a panel may think
of the procedures outlined in the rules of appellate procedure, we are bound to follow them until
they are changed. Interestingly, despite the dissent's elaborate hyperbole with respect to "justice
requiring" something other than the procedure mandated in the rules of appellate procedure, there
is no authority of any kind for the proposition that there is a constitutional due process problem with
the procedure set out in Rule 41.1.

 The dissent relies heavily on the notion that once the ground for recusal was
discovered, the recused judge was obligated to present the recusal issue to the parties and
allow them an opportunity to waive the ground for recusal. There is no authority for the dissent's
proposition that a judge who discovers a ground for recusal must allow the parties an opportunity
to waive the ground for recusal. Rule 18b(5) relating to waiver of grounds for recusal by parties
is permissive. See Tex. R. Civ. P. 18b(5); see also Tex. Code Jud. Conduct, Canon 3(B)(1) ("A
judge shall hear and decide matters assigned to the judge except those in which disqualification is
required or recusal is appropriate." (Emphasis added.)). It does not require a judge who is not
inclined to serve on a case where a ground for recusal may exist to present the issue to the parties
and serve on the case if the ground for recusal is waived. (16) It allows such a procedure under certain
circumstances if everyone--including the judge--is agreeable to it. (17) See, e.g., Nueces County
Drainage & Conservation Dist. v. Bevly, 519 S.W.2d 938, 949-51 (Tex. Civ. App.--Corpus Christi
1975, writ ref'd n.r.e.) (supp. op.).

 In addition to refusing to participate in the decision of the case without any
legal basis, the dissent misreports the facts. A crucial element of the dissent's complaint against
Justice Pemberton and this Court is the dissent's repeated allegation that Justice Pemberton
participated in "deliberations" and/or "the decision-making process" in this case. The truth is that
he did not. The implication of the dissent's rendition is to suggest that the recused judge participated
in discussions with the other panelists regarding the merits of the case and exercised some sort of
unstated influence on the other panelists (including, presumably, on the dissenting judge herself). 
This is not the case. The only contact that the recused judge had with the other panel members on
this case was to sit in oral argument and then express a tentative vote (without discussion or any
sort of deliberation of the merits) immediately after oral argument regarding whether the case should
be affirmed or reversed. (18) This author also expressed a tentative vote without any discussion of the
merits. Both this author and Justice Pemberton expressed the need for further study to develop our
views of the case due to the complexity of the issues. The lack of any discussion or deliberation of
the merits at that point was not atypical for a case of this complexity. We both acknowledged that
our views on the issues were not fully developed and our tentative vote might change based on
further study of the legal authorities and the record. The author of the dissent did not express
any vote or opinion in the case--tentative or otherwise--other than to say that she needed to "look
at the record." (19) The entire event that the dissent likes to term a "deliberation" when the panel
left the bench after oral argument lasted less than a minute. It is more appropriately described as
a postponement of deliberation due to the need for more study. All of the panelists realized after
oral argument that further study and record review would be required for dispositive opinions to
be developed. In short, contrary to the repeated assertions by the dissent that the recused judge
participated in the "decision-making process," the fact of the matter is that the recused judge did not
participate in any substantive discussions or deliberations of this case with either of the other
panel members (including the dissenting judge).

 Justice Pemberton did not participate in the decision in this case. In fact, the
dissenting judge has not participated in the decision in this case. The case has been decided by this
author and Justice Puryear.

 The motive for the writing that is styled a dissent in this case escapes the majority.
Nonetheless, the dissent takes a position that is plainly untenable under the rules of appellate
procedure and under the Code of Judicial Conduct. The dissenting judge cannot declare herself
"conflicted" or "tainted," continue as an assigned judge on the panel to complain about a procedural
decision that does not impact the merits, and yet refuse to fulfill her obligation as an assigned judge
to decide the case. Under the law, she is obligated to either recuse herself (if she truly believes she
is "conflicted" or "tainted" or no longer unbiased), or decide the case (if she elects to continue as an
assigned judge because she does not actually think she is "conflicted" or "tainted").

 Here the dissent has done neither. She has not recused herself, nor has she
participated in deciding the case. This is not only a failure to fulfill obligations imposed by the
Code of Judicial Conduct, see Tex. Code Jud. Conduct, Canon 3(B)(1), but it is also a disservice to
the members of this Court who have done their duty pursuant to the applicable rules, see Tex. R.
App. P. 41.1, a disservice to the recused judge who acted quite properly and fairly, a disservice to
the public who now have an entirely unnecessary discussion of internal court procedure deposited
into case law and many hours of judicial resources wasted on the effort, as well as a disservice to the
parties in this case who are entitled to the participation and opinions of all judges assigned to and
serving on the panel for purposes of the disposition of the case.



 __________________________________________

 G. Alan Waldrop, Justice

Before Justices Patterson, Puryear and Waldrop;

 Dissenting Opinion by Justice Patterson

Affirmed in part; Reversed and Rendered in part

Filed: March 26, 2010
1. Tex. Util. Code Ann. §§ 11.001-66.016 (West 2007 & Supp. 2009).
2. ETT's application was filed and approved prior to the 2009 legislative session, and
therefore, our review of sections 37.051 and 37.151 of the PURA is in accordance with the pre-2009
versions of those statutes.
3. One of the three PUC commissioners dissented to the disallowance of reimbursement of
the Cities' expenses.
4. Section 39.051 of the PURA provides further evidence that transmission and distribution
may be provided by separate entities. As part of the transition to competitive retail market, each
electric utility was required to separate its business activities into a power generation company,
a retail electric provider, and a transmission and distribution utility. See Tex. Util. Code Ann.
§ 39.051(b) (West 2007). As to that process of separation, section 39.051 specifically provides that
the electric utility "may create separate transmission and distribution utilities." Id. § 39.051(c).
5. Moreover, there are circumstances in which transmission-only utilities are specifically
provided for by statute. For example, according to testimony before the Commission in connection
with ECC's application, the Lower Colorado River Authority is an existing utility operating
transmission lines. The Texas Water Code provides that a river authority may "provide transmission
services, as defined by the Utilities Code or the Public Utility Commission of Texas," see Tex. Water
Code Ann. § 152.301(a) (West 2004), and yet such statutory authority does not relieve a
river authority from "an obligation to comply with each provision of the Utilities Code concerning
a certificate of convenience and necessity for a transmission facility," see id. § 152.302(2)
(West 2004). Under appellees' statutory interpretation that the PURA does not authorize the grant
of a CCN to a utility that provides only transmission services, water code section 152.302 would bar
a river authority from providing the very transmission services that are authorized by water code
section 152.301.
6. Our holding is only that a transmission-only utility can obtain a CCN without a
"certificated area." We do not consider whether an electric utility that provides any services other
than transmission can obtain a CCN without a "certificated area."
7. In the absence of some showing, either by legislative history or otherwise, that the intent
of the legislature in adopting the amendment was to clarify rather than change the statute in question,
the presumption is of change rather than clarification. Williamson Pointe Venture v. City of Austin,
912 S.W.2d 340, 345 (Tex. App.--Austin 1995, no pet.). We note that the bill analysis for
House Bill 3406, which contains the amendments to PURA sections 37.051 and 37.151 that were
later added to the existing House Bill 3309, references the district court's findings in this case
and provides that the legislation "clarifies" the Commission's authority to issue CCNs to "new
owners and operators of certain wholesale electric transmission facilities that do not have traditional
utility 'service areas.'" See House Comm. on State Affairs, Bill Analysis, Tex. H.B. 3406, 81st Leg.,
R.S. (2009).

8. Section 37.154 also provides that "[a] sale, assignment, or lease of a certificate or a right
is subject to conditions the commission prescribes." Tex. Util. Code Ann. § 37.154(b) (West 2007). 
No allegation has been made in this suit that the approved transfer to ETT violated any conditions
prescribed by the Commission.
9. Subsection (a) of PURA section 37.056, which states the general test regarding whether the
Commission may grant a CCN, requires that the CCN be "necessary for the service, accommodation,
convenience, or safety of the public." See id. § 37.056(a) (West 2007). Subsection (c), which lists
specific considerations involved in the Commission's determination, requires consideration of,
among other factors, the adequacy of existing service and the need for additional service. See id.
§ 37.056(c).
10. Appellees contend that ETT obtained certain facilities by transfer that were not subject
to TCC's existing CCN. To the extent that ETT intends to provide service to the public in a manner
that requires a CCN from the Commission and the CCN obtained by the transfer at issue in this
case does not encompass such service, ETT would need to obtain a new CCN or amend its existing
CCN in accordance with PURA sections 37.051 and 37.056.
11. The Commission appears to contend that a proceeding in which rates are set is not a
ratemaking proceeding if the setting of rates is not the primary issue in the proceeding. We find no
legal authority addressing expense reimbursement in a proceeding involving an electric utility's rates
that reflects such a limitation. See Tex. Util. Code Ann. §§ 11.003(17), 33.023 (West 2007);
see also Southwestern Pub. Serv. Co. v. Public Util. Comm'n, 962 S.W.2d 207, 219-20
(Tex. App.--Austin 1998, pet. denied) (holding that ratemaking proceeding directly results in
changed rates to customers, not that its primary purpose is to do so).
12. Justice Pemberton was originally assigned to the panel on this case. Shortly after
oral argument and before the panel had decided the case, he discovered that a family member
arguably had an indirect financial interest in the outcome. He immediately disclosed this to the
Court and recused himself. After determining that the remaining two members of the panel could
not agree on a decision, the Chief Justice of this Court assigned a new third panelist to the case
pursuant to Texas Rule of Appellate Procedure 41.1. Justice Pemberton took no part in the decision
of this case.
13. The dissent cites five cases that allegedly stand for the proposition that a judge may
disagree with a procedural ruling in a case and use that disagreement as a basis to avoid deciding the
case. Rather than providing support for the dissent's failure to participate in the decision of the case,
however, each of the concurrences or dissents cited expressly addresses the proper disposition of the
case. Thus, each of the judges in those opinions, while expressing opinions that differed with the
majority on procedural issues, still recognized the obligation to participate in the decision of the case.
14. For example, a panelist might disagree with a majority's decision not to dismiss a case on
jurisdictional grounds. Under such circumstances, that panelist does not believe the court should be
deciding the merits of the case at all. However, this does not relieve that panelist of the obligation
to decide the merits in the event the majority rules that the case should not be dismissed. Many other
examples exist.
15. We note that the dissenting judge has not at any point put the parties in this case on notice
of what she perceives to be a "potential conflict" that prevents her from deciding the case and offered
them the opportunity to waive it. Nor has the dissenting judge ever requested that the panel or the
Court send the parties notice that she believes she has a "potential conflict," a description of the
nature of her "potential conflict," or an opportunity to waive her "potential conflict"--a problematic
fact considering the thesis of the dissent.
16. Indeed, the dissenting judge does not follow the very procedure she claims is required. 
The dissenting judge has recused herself from a number of cases after being assigned. We are aware
of no example of an instance where the dissenting judge put the parties on notice of a ground for
recusal and gave them an opportunity to waive the issue before recusing herself. There are numerous
examples of the dissenting judge recusing herself without putting anyone--parties or the court--on
notice of the basis or ground for the recusal or allowing anyone to waive the ground. The dissenting
judge suggests that the timing of when a judge learns of a basis for recusal somehow dictates whether
the judge must give the parties an opportunity to waive recusal. There is, of course, no basis in the
rules or case law for such a notion.
17. We note that the parties were put on notice of the recusal with ample opportunity to raise
an objection or complaint regarding the procedure this Court has followed, both with respect to
the recusal and to the reconstitution of the panel. No party has raised any objection or complaint. 
The dissent has injected her complaint into this case sua sponte without the benefit of any objection
by a party, any party having raised the issue, or any party briefing the question. The parties will be
understandably surprised and chagrined to learn that they do not have the benefit of all three
panelists' views on this case due to an issue none of them has raised or complained about, and that
the disposition of this case has been substantially delayed due to what has turned out to be a rather
lengthy process of producing opinions relating to this "dissent."
18. Justice Pemberton had not yet discovered the basis for his recusal.
19. Indeed, the dissenting judge has not expressed an opinion or vote on the merits of this case
at any point.